# IN THE MATTER OF THE APPLICATION OF THE HAWAIIAN ELECTRIC COMPANY, LIMITED, FOR APPROVAL OF CHANGES IN ITS DEPRECIATION CHARGES AND PRACTICE.

## No. 3040.

ARGUED AUGUST 14, 1957.                    DECIDED DECEMBER 10, 1957.

### RICE, C. J., STAINBACK AND MARUMOTO, JJ.

OPINION OF THE COURT BY MARUMOTO, J.

This is an appeal by The Hawaiian Electric Company, Limited, from Decision and Order No. 840, in Docket No.

1230, of the Public Utilities Commission of the Territory of Hawaii, entered on May 25, 1955. The order governs the depreciation practice of the company for rate-making purpose after December 31, 1954.

In this opinion, "1955 order" refers to the above mentioned order; "1940 order" refers to Order No. 327, in Docket No. 561, entered on March 19, 1940; "sinking fund method" and "straight line method" refer to such methods of depreciation in which depreciation is computed on group basis; and "plant" refers to the company's depreciable plant and all components of such plant.

On September 10, 1954, the company filed with the commission an application for approval of changes in its depreciation charges and practice, in which it proposed:

(a) To change its depreciation practice by changing from a 5% sinking fund method of computing depreciation accruals prescribed by the 1940 order to a straight line method;

(b) To transfer all depreciation reserve balances as of December 31, 1953, to five depreciation reserve sub-accounts mentioned in the application;

(c) To make depreciation accruals for 1954 and subsequent years, to the plant in service on December 31, 1953, on a straight line remaining life basis by applying the percentage rates mentioned in the application; and

(d) To make depreciation accruals to net additions to the plant placed in service after December 31, 1953, on a straight line average service life basis by applying the percentage rates mentioned in the application.

The commission denied the application. Instead, by its 1955 order, it required the company, effective as of January 1, 1955:

(a) To change its depreciation accounting from

5% sinking fund whole life method to 4% sinking fund method in which the accounting shall be maintained by primary accounts;

(b) To apply the depreciation accrual rates under the 4% sinking fund method, utilizing remaining life principle as fully as reasonably practical, the remaining life accrual rates to be applied to the plant, less net salvage, as of December 31, 1954, and subsequent additions to be on the whole life basis, with the added requirement that at four-year intervals the plant subject to the remaining life application shall be advanced four years;

(c) To apply the depreciation accrual rates for 1955 and for the future under the 4% sinking fund method based upon the lives, mortality dispersions and salvage values which yield the depreciation results in Exhibit C, Tables B-V and B-VII, and as developed from base exhibits Nos. 7 and 10; and

(d) In the normal course of its depreciation accounting, to continue its study as to the adequacy of the depreciation accrual rates and as to the depreciable capital upon which they are applied, the results of such study, with recommendations, to be reported to the commission at not less than four-year intervals, the first report to be due on June 30, 1958, for the year ending 1957.

Exhibit C mentioned in the order is an exhibit in Docket No. 1233, and Tables B-V and B-VII therein contain an estimate of the results of operations under the 4% sinking fund remaining life method and an estimate of additional gross revenue requirements under the various methods that were considered. Such estimates were made for the commission by Roy A. Wehe, its technical consultant. Docket No. 1233 relates to an application for approval of revised schedules of rates and charges filed by the

company on July 26, 1954. Base exhibits Nos. 7 and 10 are exhibits in Docket No. 1230 which contain a study of the lives, mortality dispersions and salvage values made by Commonwealth Services, Inc., of New York, a management consultant firm hired by the company to make a depreciation study for it.

On this appeal the company confines its objection to that portion of the order which requires it to compute its depreciation on a remaining life basis. It does not object to the denial of its application to change to a straight line method. Nor does it object to the adoption of a 4% sinking fund method, if it is allowed to compute its depreciation on a whole life basis.

In a public utility case, the question of depreciation is usually connected with the question of fair return. Here the company does not complain that the 1955 order prevents it from earning a fair return on its investment. Contemporaneously with the filing of its application for approval of changes in its depreciation charges and practice, the company filed its application for approval of revised schedules of rates and charges. The commission entered its order in the rate case, being Decision and Order No. 841, in Docket No. 1233, on May 27, 1955, just two days after the order in the depreciation case. The company has not appealed from the order in the rate case.

The nature of the company's objection may be explained by reference to certain figures. Some of the figures are not contained in the record on appeal. They are found in the supplemental memorandum filed by the company at the request of the court. We refer to those figures for illustrative purpose only.

The 1940 order governed the depreciation practice of the company until December 31, 1954. On that day the company had plant in service which had cost $66,725,026. A portion of such plant, costing $53,288,122, was in serv-

ice on December 31, 1953, and the remainder, costing $13,436,904, was placed in service during 1954.

On December 31, 1954, the book reserve for depreciation, computed according to the 1940 order, was $11,016,309. The theoretical reserve requirement, as of the same day, computed under the 4% sinking fund method would have been $7,627,568. Thus, there is a difference of $3,388,741. The company refers to this difference as the "excess" in the book reserve for depreciation.

For the year 1955, the depreciation computed under the 1955 order was $1,355,655. The depreciation computed under the 4% sinking fund whole life method would have been $1,457,025. Thus, there is a difference of $101,370. Similar differences will occur annually during the remaining life of the plant in service on December 31, 1954. Such annual differences will eventually add up to $3,388,741. The company refers to the accumulation of such annual differences as the "amortization" of the excess in the book reserve for depreciation.

These annual differences occur because the 1955 order is designed to depreciate the difference between the cost of the plant in service on December 31, 1954, and the book reserve for depreciation, less salvage, during the remaining life of such plant, while the 4% sinking fund whole life method depreciates the difference between the cost of such plant and the theoretical reserve requirement under such method, less salvage, during the same period.

With the above mentioned figures before us, we may now state the company's objection to the 1955 order. It is as follows: the order prescribed the 4% sinking fund whole life method, effective January 1, 1955; the commission, by prescribing such method, placed the excess in the book reserve for depreciation beyond its pale; once having placed such excess beyond its pale, the commission may not reach it by any means; to do so is confiscatory; the

application of the remaining life principle amortizes such excess over the remaining life of the plant and in effect takes away such excess; therefore, the application of the remaining life principle is confiscatory.

Under our statute the commission is authorized to prescribe an accounting system for a public utility, which shall be just and reasonable and shall be such as to provide a fair return to the utility on its investment. (R. L. H. 1955, § 104-15) An order of the commission is reviewed by this court in like manner as a decree of a circuit judge at chambers. (*Honolulu Gas Company, Limited* v. *Public Utilities Commission,* 33 Haw. 487, 521)

The authority of the commission under our statute is similar to that of the Federal Power Commission, discussed in *Federal Power Commission* v. *Natural Gas Pipeline Co.,* 315 U. S. 575. There the court said, per Chief Justice Stone, at page 586: "The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make *pragmatic adjustments* which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, *as applied to the facts before it and viewed in its entirety,* produces no arbitrary result, our inquiry is at an end." (Emphasis supplied)

The company takes the position that the commission overstepped the limits of due process. Its sole specification of error states: "The Commission erred, as a matter of law, in ordering the Company to amortize the over-accrual in its book depreciation reserve of $3,388,741, as compared with the theoretical reserve requirement on the 4% sink-

ing fund (group procedure) basis, over the remaining life of its depreciable properties, thereby taking from the Company and awarding to future ratepayers property which legally belongs to the Company." It argues: "The law is well established that excess depreciation charges accumulated in the past belong to a utility and cannot be recovered or appropriated for the benefit of current or future ratepayers."

The company relies on *Board of Public Utility Commissioners* v. *New York Telephone Company*, 271 U. S. 23. That case involved an order of the Board of Public Utility Commissioners of New Jersey, which denied an application of the telephone company for approval of increase in its rates although the existing rates did not produce a return which the board found to be fair. The board based its denial on a finding that there was an excess in the reserve for depreciation of $4,750,000. The reserve had been built up under service rates that were lawful when charged and during a period when no method of depreciation had been prescribed. For the year 1925 the estimated additional amount needed for a fair return was $2,631,286. The board directed that, beginning January 1, 1925, and until such time as the excess of $4,750,000 was absorbed, the additional amount needed for a fair return in any year be made up by deducting such amount from the "normal charge" for depreciation for the year. The normal charge for depreciation for 1925, computed according to the method prescribed by the board was $3,314,716. The direction to make up the additional amount necessary for a fair return by deducting such amount from the normal charge for depreciation meant that the telephone company was allowed only $683,430 for depreciation for the year, instead of $3,314,716. The court held that the order of the board was confiscatory. In so holding, the court stated: "And the law does not

require the company to give up for the benefit of future subscribers any part of its accumulations from past operations. Profits of the past cannot be used to sustain confiscatory rates for the future."

The language of *Board of Public Utility Commissioners* v. *New York Telephone Company* supports the company's position. But the holding may not have the broad significance that the language implies, when it is considered in connection with *Lindheimer* v. *Illinois Bell Telephone Company,* 292 U. S. 151.

In the *Lindheimer* case, the Illinois Commerce Commission made a finding that the telephone company had accumulated a reserve for depreciation considerably in excess of the reserve requirement. Pursuant to such finding, it issued an order which provided for a "combined maintenance and replacement allowance" which it deemed adequate to protect the company's investment and permit it "to accrue a reserve in the anticipation of property retirements." This was no more, no less, than the application of the remaining life principle to the situation that confronted the Illinois commission. The court refused to hold that the order was confiscatory.

In the light of the *Lindheimer* case, the holding in *Board of Public Utility Commissioners* v. *New York Telephone Company* does not appear to apply to every case in which there is an excess in the reserve for depreciation but is limited in its application to the particular facts in that case. If the order of the board were sustained in that case, the telephone company would have been deprived of $2,631,286 in its reserve for depreciation in one year and $2,118,714 of such reserve in the following year in order to make up the deficiencies in fair return resulting from rates that were obviously confiscatory. It cannot be said that the order of the board, as applied to the facts before it and viewed in its entirety, did not produce an

arbitrary result. (*Federal Power Commission* v. *Natural Gas Pipeline Co., supra*)

Thus far we have considered the company's contention without questioning the assumption upon which it is based. The basic assumption of the company is that the 1955 order prescribed a 4% sinking fund method applicable on a whole life basis to the entire plant in service on December 31, 1954.

The 1955 order does not contain any language that warrants such assumption. If we accept the plain meaning of plain words, the order prescribed a 4% sinking fund method, to be applied on a remaining life basis with respect to plant in service on December 31, 1953, and on a whole life basis with respect to additions to such plant made after such date. The order further prescribed that such additions be included in the plant subject to the remaining life principle quadrenially.

If the commission may not legally superimpose a remaining life principle on a sinking fund method, as the company contends, then the order must be held invalid in its entirety. We may not convert the order into something other than what it is by judicial construction. The company's contention, based as it is on an assumption that is not warranted, must be rejected. However, inasmuch as the company has raised the question of the validity of the order insofar as it prescribes the 4% sinking fund method on a remaining life basis, we shall consider whether the order is invalid on any ground other than that asserted by the company. In this connection, it is necessary that we have an understanding of the function of depreciation in public utility accounting.

A public utility is entitled to a fair annual return on its investment. In arriving at such fair return all items of expense incident to the earning of the return must be taken into consideration. One such item of expense is the

wearing out of plant units. Large units do not wear out within a single accounting period. All depreciation methods are designed to recover the net cost of such units during their service lives. The differences in the methods arise from differences in opinion as to the most desirable methods of allocating such expense to each accounting period during the service lives of such units.

The Committee on Accounting Procedure of the American Institute of Accountants defines depreciation accounting as follows:

> *"Depreciation accounting* is a system of accounting which aims to distribute the cost or other basic value of tangible capital assets, less salvage (if any), over the estimated useful life of the unit (which may be a group of assets) in a systematic and rational manner. It is a process of allocation, not of valuation. *Depreciation for the year* is the portion of the total charge under such a system that is allocated to the year. Although the allocation may properly take into account occurrences during the year, it is not intended to be a measurement of the effect of all such occurrences." (American Institute of Accountants, *Accounting Research Bulletin* No. 22, May 1944; *Accounting Terminology Bulletin* No. 1, August 1953)

The foregoing definition is in accord with the discussion of depreciation by Justice Brandeis in *United Railways and Electric Company of Baltimore* v. *West,* 280 U. S. 234, at pages 260-265. Justice Brandeis explains that a depreciation charge is an apportionment of a part of the total expense incident to the wearing out of the plant to the operations of a year for the purpose of ascertaining the profits of the year, and states: "The main purpose of the charge is that irrespective of the rate of depreciation there shall be produced, through annual contributions, by the end of the service life of the depreciable plant, an amount

equal to the total net expense of its retirement. To that end it is necessary only that some reasonable plan of distribution be adopted."

Justice Brandeis' discussion of depreciation is contained in a dissenting opinion. It is not the less cogent for that reason. His position in that case subsequently became the position of the court. (*Lindheimer* v. *Illinois Bell Telephone Company, supra,* and *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U. S. 591)

Both under the American Institute of Accountants definition and the opinion of Justice Brandeis, depreciation is an allocation concept. It is not a factual concept except as it relates to entire service life. On this point, the Committee on Terminology of the American Institute of Accountants states: "Definitions are unacceptable which imply that *depreciation for the year* is a measurement, expressed in monetary terms, of the physical deterioration within the year, or of the decline in monetary value within the year, or, indeed, of anything that actually occurs within the year. True, an occurrence within the year may justify or require a revision of prior estimates as to the length of useful life, but the annual charge remains an allocation to the year of a proportionate part of a total cost or loss estimated with reference to a longer period." (American Institute of Accountants, *Accounting Terminology Bulletin* No. 1, August 1953, par. 54) Justice Brandeis also states that an annual depreciation charge is not a measure of the actual consumption of plant during the year and that: "Many methods of calculating the amount of the allowance are used. The charges to operating expenses in the several years and in the aggregate vary according to the method adopted. But under none of these methods of fixing the depreciation charge is an attempt made to determine the percentage of actual consumption of plant falling within a particular year or

within any period of years less than the service life."

There is no legal requirement that any particular method of depreciation be used. Nor is there any requirement that a method once adopted be maintained throughout the service life of a plant. Justice Holmes once said: "The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics." (*Lochner* v. *New York,* 198 U. S. 45, 75) So may it be said of the Fifth Amendment, that it does not sanctify the straight line method, the sinking fund method, or any variation thereof. Time and circumstances change men's ideas. Public utility experts are not immune. Today the straight line method is in vogue in public utility accounting. Wetmore Dawes, consultant with Commonwealth Services, Inc., testified: "The straight line method is not only recommended by the committee on depreciation of the National Association of Railroad and Utility Commissioners but it is the most modern method and the one used by 96 percent of the utilities of the country." It was not so twenty years ago. In 1940 the company expressed a preference for the 5% sinking fund method over the straight line method. On this point George Hogg, treasurer of the company testified: "I think that that was brought about at the time of that case, that sinking fund depreciation was the way that the California commission looked upon it, and that perhaps we should follow along these lines." In public utility accounting, as in any other field: "The necessity of checking the results is not questioned. The predictions must meet the controlling test of experience." (Hughes, C. J., in *Lindheimer* v. *Illinois Bell Telephone Company, supra*)

Depreciation accounting is an element in the process of rate-making. As such, the statement of Chief Justice Stone in *Federal Power Commission* v. *Natural Gas Pipeline Co., supra,* previously quoted, is equally applicable in this case. See also the opinion of the court by Justice

Douglas in *Federal Power Commission* v. *Hope Natural Gas Co., supra,* at page 602, where it is stated: "It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences."

The 1955 order represents a conscientious effort on the part of the commission to achieve a result which is fair both to the company and the customers by making pragmatic adjustments.

Back in 1939, the commission employed William A. Dittmer, E. L. Woodill, John H. Kangeter and A. V. Roberts, to make a study of the affairs of the company. They reported that the depreciation practice of the company was "unorthodox." Under its practice, the company had accumulated a reserve for depreciation of $6,184,795, as of December 31, 1938, which was excessive by any standard. They recommended the adoption of a sinking fund method, which was set forth in the 1940 order. This method is characterized as the 5% sinking fund whole life method, group basis, in the 1955 order. However, it differs from a conventional sinking fund whole life method in that it started with an initial reserve of $2,776,181, which was larger than the theoretical reserve requirement. The initial reserve was larger than the theoretical reserve requirement because it was based on the age and expectancy of the plant in service on December 31, 1938, instead

of on the shorter average lives, and represented the full accumulation of the expired life of the surviving plant without any assumed short-lived retirements which would serve to reduce the amount of the reserve. This was done because the company had in the past set up sufficient depreciation, or charged to operating expenses, as extraordinary losses, amounts large enough to take care of all early retirements in full. As to the propriety of this procedure, Wetmore Dawes testified as follows:

"Q Mr. Dawes, do you consider that the method used to compute the reserve requirement in The Report on the Affairs of The Hawaiian Electric Company, Limited, 1939, was a mistake?"

"A No, sir. I will call attention to the authors of the report and direct your attention to the fact that Mr. Dittmer was also a member of the special committee on depreciation of the National Association of Railroad and Utility Commissioners during the years 1937 to 1939."

In the computation of depreciation under the 1940 order, the interest factor was computed on this large reserve and the annuity factor was computed by applying whole life rates to the plant balances. This resulted in the building up of a still larger reserve because of the influence of the interest component in the depreciation which was computed on the large reserve. By December 31, 1953, the book reserve for depreciation was $10,558,766, compared to a theoretical reserve requirement of $6,656,954 under the conventional 5% sinking fund whole life method, or a difference of $3,901,812. However, such book reserve for depreciation was less than the reserve requirement of $11,084,693, as of such date, under a straight line whole life method, by $525,927.

Under a stipulation with the commission in Docket No. 1167, dated January 12, 1953, the company undertook

to make a depreciation reserve requirement study. It employed Commonwealth Services, Inc., for this purpose. The study showed that the reserve requirement under the 1940 order was $11,121,260. This represented a difference of only $36,567 as compared with the reserve requirement under the straight line method. It also showed that the company's practice under the 1940 order closely approximated the results obtained from the straight line method. In the circumstance, Commonwealth Services, Inc., stated in its report to the company: "We recommend that the Company change its depreciation practice to the straight-line method. This method is almost universally used in the utility industry and it is used by all other public utilities in the Territory of Hawaii."

The company, thereupon, filed its application in the instant case to change its depreciation practice to a straight line method. However, in order to make up the deficiency of $525,927 in the book reserve for depreciation as compared with the reserve requirement under the straight line whole life method, it proposed to compute the depreciation in the plant in service on December 31, 1953, on a remaining life basis.

At the hearing, the commission offered estimates developed by its staff as to the impact on the revenue requirements of the company under the various methods that were suggested. Such estimates showed that for 1955, under the straight line remaining life method, the company required $2,321,000 additional gross revenue in order to earn a return that was determined by the commission to be fair, while under the 4% sinking fund remaining life method it required an additional gross revenue of only $1,101,600, a difference of $1,219,400. Faced with such estimates, the commission prescribed the latter method. It stated: "This Commission must conclude that, insofar as this record justifies a conclusion, the theory of the sink-

ing fund practice is basically sound and has more points of superiority than that of the straight line practice. However, mere theoretical advantages under either method are not in themselves controlling. This Commission must be very practical. We face the stark reality of granting or denying a request that, if granted, will greatly increase the gross revenue required, as opposed to continuing on the sinking fund basis, with a substantial saving to the consumers of electric service for a long time in the future."

The method prescribed in the 1955 order retains the book reserve for depreciation. The reserve is larger than the theoretical requirement under the conventional 4% sinking fund whole life method but less than the requirement under the straight line whole life method. The order eliminates the feature of the 1940 order which built up the reserve beyond the amount required for the ultimate retirement of the plant, by requiring the application of remaining life rates, instead of whole life rates, to the plant in service on December 31, 1954.[1] It provided for any future change in circumstances or estimates by requiring the company to continue its study as to the adequacy of depreciation accrual rates as applied to its plant and to report the results of such study quadrennially.

The method proposed by the company and the method prescribed in the 1955 order start at the same point. Both start with the book reserve for depreciation. They have the same objective. Both are designed to provide the amount necessary to cover the net cost of retiring the plant. The net cost of retiring the plant is the same under either

[1]Although the 1955 order provides that remaining life rates be applied to the plant in service on December 31, 1954, and whole life rates to subsequent additions, the company computed the depreciation for 1955 by applying remaining life rates to the plant in service on December 31, 1953, and whole life rates to subsequent additions, because under the company's practice depreciation for the current year is computed on the plant balances outstanding at the end of the previous year. This method of computation has the approval of the commission.

method. They achieve the objective during the same period of time, namely, during the remaining life of the plant. The only difference between the two methods is that they reach the objective by slightly different routes. Under the company's proposal annual depreciation will be larger than under the order of the commission during early years. But annual depreciation under the order of the commission will accelerate during later years and exceed the annual depreciation under the company's proposal.

The company states that it will not ask permission to transfer the excess in the book reserve for depreciation resulting from the adoption of the 4% sinking fund whole life method to surplus, but will set up such excess in a special reserve to be "retained as part of the total depreciation reserve (deducted in determining the depreciated rate base), available for use if future studies showed the regular reserve deficient or for other contingencies." This proposal follows the caution of the Committee on Depreciation of the National Association of Railroad and Utilities Commissioners against the transfer of an excess in the reserve for depreciation to surplus in a situation where such excess exists. (National Association of Railroad and Utilities Commissioners, *Report of Committee on Depreciation,* 1943, p. 115)

We may not consider the merit of such proposal on this appeal. The company did not make such proposal to the commission. Our jurisdiction in matters relating to accounting procedure of a public utility is appellate and not original. It may also be noted that the company makes such proposal only as a voluntary act on its part and that in so doing it does not recede from the position that the commission has no authority over the excess under *Board of Public Utility Commissioners* v. *New York Telephone Company, supra.*

Our only concern is as to the validity of the 1955 order.

It is valid if the method prescribed is reasonable. Absence of precedent does not make it suspect. We cannot say that the order, as applied to the facts before the commission and viewed in its entirety produces an arbitrary result or that its total effect is unjust and unreasonable.

Affirmed.

*Marshall M. Goodsill* (*Anderson, Wrenn & Jenks* and *Hugh Shearer* with him on the briefs) for appellant.

*Richard K. Sharpless,* Assistant Attorney General (also on the brief) for appellee.