NORMAN W. H. DANG and MUNEO YAMAMOTO, Plaintiffs-Cross-Appellants, and NORMAN M. MURANAKA, JAMES T. SHAW, and SAMUEL A. WONG, Plaintiffs-Appellees, *v.* F and S LAND DEVELOPMENT CORPORATION, Defendant-Appellant, Cross-Appellee, and ROBERT Y. SHIMADA, Defendant

NO. 6443

OCTOBER 7, 1980

RICHARDSON, C.J., OGATA, MENOR, LUM AND NAKAMURA, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

Defendant-Appellant-Cross-Appellee F & S Land Development Corporation (hereafter F & S) appeals from the portion of a final judgment of the Circuit Court of the Second Circuit in favor of Plaintiffs-Appellees Norman M. Muranaka, James T. Shaw, and Samuel A. Wong (hereafter Muranaka, Shaw, and Wong respectively); Plaintiffs-Cross-Appellants Norman W. H. Dang and Muneo Yamamoto (hereafter Dang and Yamamoto respectively) appeal from the portion of the same judgment favoring F & S. Although several other issues are raised by the appealing parties, the dispositive questions are those related to the legal consequences of the transactions whereby Muranaka, Shaw, Wong, Dang, and Yamamoto tendered money to F & S to

partially finance the construction of a warehouse in Kahului, Maui, on alleged promises that they would receive double the sums tendered within a year. We conclude the transactions were, in essence, usurious loans and reverse that part of the judgment favoring Muranaka, Shaw, and Wong and affirm that part favoring F & S.

I.

Muranaka, Shaw, Wong, Dang, and Yamamoto (hereafter collectively referred to as plaintiffs) filed a joint, six-count complaint against F & S and Robert Y. Shimada (hereafter Shimada) alleging in separate counts that they individually invested money in a joint venture involving the construction of a warehouse on the corporation's promise, delivered orally through its president, Harold Freitas (hereafter Freitas), or its secretary-treasurer, Shimada, that each plaintiff would receive double his investment within one year.[1] The complaint further averred Shimada personally guaranteed the return of twice the invested sums to Muranaka, Shaw, Wong, and Yamamoto.[2] The count delineating the transaction between Dang and F & S, however, did not allege there was a personal guarantee that the investment would provide such a return. A separate count asserted "false representations" by defendants regarding the "promised return of twice [the] original investment," upon which plaintiffs "justifiably relied."[3]

The responsive pleading filed by F & S and Shimada characterized the relevant transactions as loans and alleged

---

[1] Muranaka, Dang, and Yamamoto each tendered $10,000, received $11,200 ($10,000 plus $1,200), and sought judgment for $8,800 (the difference between the amount allegedly promised and the sum actually received). Shaw and Wong each tendered $5,000, received $5,600, and sought judgment for $4,400.

[2] The trial court ruled the claims against Shimada premised on the alleged personal guarantees were unenforceable because of the Statute of Frauds. Plaintiffs-cross-appellants have not appealed from this part of the judgment and Shimada is not involved in this appeal as an individual.

[3] The fraud count was apparently abandoned before trial.

they had been repaid with interest at a legal rate. It further interposed affirmative defenses premised on HRS § 478-4 (the usury law),[4] the Statute of Frauds, laches, and the statute of limitations. Defendants' pre-trial statement added accord and satisfaction as a defense.

Defendants sought summary judgment before trial, contending the usury statute precluded recovery by plaintiffs. The motion was denied and the case proceeded to a trial before a jury. At the close of plaintiffs' evidence and also at the close of all evidence, defendants unsuccessfully sought the direction of a verdict on the ground that the usury statute barred plaintiffs' right to relief.

Upon submission by the trial court, the jury returned the following special verdicts: (1) there were binding agreements between F & S and each of the plaintiffs except Dang; (2) the binding agreements were not usurious loans; and (3) F & S and Yamamoto had reached an accord and satisfaction with respect to the agreement between them. A judgment and an amended judgment, reflecting the foregoing, were subsequently entered in favor of Shaw, Muranaka, and Wong for the amounts they claimed and in favor of F & S on the claims of Dang and Yamamoto.[5] Following the denial of post-trial motions, including F & S's motion for a judgment not-

---

[4] The pertinent portion of our usury statute reads as follows:

§478-4 Usury not recoverable. If a greater rate of interest than one per cent a month is contracted for, the contract shall not by reason thereof, be void. But if in any action on the contract proof is made that a greater rate of interest than one per cent a month has been directly or indirectly contracted for, the plaintiff shall only recover the principal and the defendant shall recover costs; provided, that any bank may charge, contract for, receive, collect in advance, or recover interest, discount, and other charges at the same rates and in the same amounts as permitted by law in the case of loans made by industrial loan companies licensed under chapter 408, if in relation to the contract such bank shall be in compliance with sections 408-15 and 408-17 applicable to licensees under chapter 408. If interest has been paid, judgment shall be for the principal less the amount of interest paid. This section shall not be held to apply to contracts for money lent upon bottomry bonds or upon other maritime risks nor to loans made under chapter 408.

[5] On the claims related to the purported personal guarantees by Shimada, judgment was entered in his favor. As noted earlier, this portion of the judgment was not appealed.

withstanding the verdict, F & S, Dang, and Yamamoto filed their appeals to this court.

The dispositive questions, in our opinion, are: (1) whether Muranaka, Shaw, and Wong "invested" money in a joint venture or whether they "loaned" the money to F & S; and (2) if the transactions were loans, whether they were usurious. Dang and Yamamoto also raise these questions: (1) whether the trial court erred in admitting entire depositions into evidence and making the depositions available to the jury during its deliberations; and (2) whether the trial court erred in admitting testimony related to a transaction between F & S and a person who was not a party to the suit.

II.

F & S is the lessee of a parcel of land in Kahului, Maui, zoned for commercial use, on which it planned to erect a condominium warehouse building. The "condominium" concept of marketing warehouse space was apparently favored because it offered the developer a possibility of realizing a relatively quick return of investment.[6] The financing scheme for the construction of the building included an expectation on the part of F & S that the manufacturer of the structure's steel components would "finance" a substantial portion of the construction through a forbearance of payment for supplying the components until the completion of construction. When the manufacturer, contrary to expectations, demanded prompt payment, F & S was compelled to seek other means to finance this portion of the construction.

Thus, in November of 1971, Freitas and Shimada sought and secured advances from friends and acquaintances, among whom were the plaintiffs. Some of those advancing

---

[6] F & S was forced to abandon the plan to sell space in the warehouse as condominium units because of an inability to secure approval of the plan by the owner of the fee interest in the land. There is a question on whether the plaintiffs who dealt with Shimada were apprised the project was not to be a condominium warehouse; the plaintiffs assert they were not.

money at the urging of Freitas and Shimada subsequently agreed to accept shares of stock in the corporation in lieu of repayment; others, including the plaintiffs, did not. The agreements between F & S and plaintiffs were not reduced to writing and there is substantial disagreement on what they actually were. F & S claims it executed promissory notes reflecting promises to repay plaintiffs the advanced sums with interest at a legal rate sometime after the transactions. Several of these were allegedly delivered to plaintiffs who deny receiving them.

In July and August of 1972, F & S repaid all plaintiffs except Yamamoto[7] the sums advanced and what it avers was interest at a rate of more than one per cent per month. Plaintiffs, however, sought a full one hundred per cent return and in March of 1975 filed suit against F & S and Shimada, claiming they were each promised a return of twice the "investment" rather than the amounts they actually received.

III.

Plaintiffs, as we have noted, characterize the pertinent transactions as investments in a joint venture; F & S, on the other hand, describes them as loans. But rights and obligations flowing from a transaction are governed by its substance rather than its form or the appellation selected by a party. *Kawauchi v. Tabata*, 49 Haw. 160, 171, 413 P.2d 221, 227 (1966). And as "neither artifice nor form nor superficial declaration of intention will successfully obscure the true nature of . . . [a] transaction," *Hess v. Paulo*, 38 Haw. 279 at 286 (1949), we are obliged to seek the substance of the agreements in question from the evidence in the record.

A.

We first consider whether there is evidence demonstrating, or from which it may be inferred, that plaintiffs and F & S

---

[7] In April of 1972, Yamamoto requested the return of the sum he advanced and was repaid that sum. He received $1,200 more when the other plaintiffs received their money.

formed a joint venture. A "joint venture is closely akin to a partnership, and the rules governing the creation and existence of partnerships are generally applicable to joint ventures." *Lau v. Valu-Bilt Homes, Ltd.*, 59 Haw. 283 at 289, 582 P.2d 195 at 200 (1978), quoting *Shinn v. Edwin Yee, Ltd.*, 57 Haw. 215 at 217-18, 553 P.2d 733 at 736 (1976).[8] A partnership in turn "exists where the parties have contracted to share, as common owners or principals, the profits of a business and . . . whether an agreement creates a partnership or not depends upon the intention of the parties." *Barnes v. Collins*, 16 Haw. 340 at 342 (1904). The requisite intent, however, is not to be drawn from what the parties "call or consider the relation into which they enter, but what the relation is in legal effect." *Id.* Otherwise stated, "the existence or non-existence of the partnership . . . [is] necessarily, a legal deduction to be drawn from the agreement. . . ." *Winkelbach v. Honolulu Amusement Corp.*, 20 Haw. 498 at 501 (1911).

The record discloses each plaintiff advanced money to F & S for a business purpose but it does not indicate the parties thereby agreed to participate in a joint venture. None of the terms or conditions of the transactions were contemporaneously recorded. No documents that purportedly were partnership agreements were executed and there was no effort to comply with the registration requirements of HRS Chapter 425 covering general and limited partnerships. Although plaintiffs were furnished some basic information about the project, none of them sought more particular information pertaining to the financing or construction of the building. They were neither expected to nor did they actively further any other aspect of the project, including the ultimate leasing of warehouse space. Most significantly, they neither alleged nor attempted to prove F & S realized a profit from the

[8] The statutory law applicable to partnerships was amended in 1972 to specifically provide that joint ventures are partnerships. HRS § 425-106(1) reads:

A partnership is an association (including a joint venture) of two or more persons to carry on as co-owners a business for profit.

venture;[9] plaintiffs couched their claims throughout the proceedings primarily in terms of promised returns of "twice their investments."

In determining whether a joint venture relationship exists, we have said:

> it is absolutely essential that there be an agreement between the parties for a joint venture and that there be a provision in the contract for their sharing, as joint venturers, of the profits of the business.

*Shinn v. Edwin Yee, Ltd., supra,* 57 Haw. at 218, 553 P.2d at 737. There is a definite paucity of evidence from which it can be deduced that the parties agreed to embark on a joint venture and share its profits, even when the evidence is viewed in the most favorable light for plaintiffs.

B.

Having concluded the evidence does not sustain a legal conclusion that the transactions involved a joint venture, we now consider whether the transactions could have been agreements to lend money instead and if so, whether this was at a prohibited rate.

*Kawauchi v. Tabata, supra,* teaches us that usury may assume the guise of patently valid transactions. The transaction there was structured as a sale and leaseback of real property, with a repurchase option. The relevant documents were ostensibly a promissory note, a mortgage, a deed, and a lease. We were not deterred by the form of the documents from declaring that they actually masked another agreement. In our opinion, the discounted sale price of the land and other evidence, including a letter that tied the documents together, manifested the transaction's true nature, a usurious loan. Here, the plaintiffs' claim is that the agreements represented investments. But as in *Kawauchi,* we are unable to accept a

---

[9] Although the warehouse was completed in July of 1972, Freitas testified during the trial in 1976 that the project had not generated "an adequate surplus to give dividends" to the stockholders of F & S.

characterization selected by litigants because the evidence indicates the agreements were, in substance, usurious loans.

In *Kawauchi*, the circumstances did not call for a detailed discussion of the elements of usury. Since the applicable statute does not set forth what constitutes usury, other than the proscribed interest rate, we believe it advisable to do so here. A review of pertinent precedent indicates courts generally look for these factors in deciding whether a given transaction involves usury: (1) money or its equivalent as the subject matter; (2) a loan or forbearance, either express or implied; (3) an understanding that the principal is absolutely repayable; (4) the exaction of interest in excess of that allowed by law; and (5) an intent to engage in a transaction that carries a rate of interest disallowed by law. *Jenkins v. Dugger*, 96 F.2d 727, 729 (6th Cir. 1938), *cert. denied*, 305 U.S. 623 (1938); *Britz v. Kinsvater*, 87 Ariz. 385, 390, 351 P.2d 986, 989 (1960); *Bermil Corp. v. Sawyer*, 353 So. 2d 579, 583 (Fla. App. 1977); *Liebergesell v. Evans*, 23 Wash. App. 357, 360-61, 597 P.2d 908, 911 (1979). The record establishes that all of the foregoing elements were present in the transactions at issue.

Plaintiffs advanced money with a definite understanding that they would be repaid within a year, and no one contends otherwise. Although Muranaka and Wong equivocated on occasion while testifying, the import of every plaintiff's testimony viewed in its entirety is that the promise to repay was unconditional. Here again, F & S does not argue to the contrary. Plaintiffs assert they were promised and expected a return of "twice their investments" within a year, which boils down to a one hundred per cent annual rate. There is no serious contention that a different rate of return was discussed before the money was advanced. F & S maintains its promise was only to pay interest at a legal rate, but the alleged belated execution of promissory notes calling for interest at legal rates and a failure to transmit the notes to all plaintiffs appear to belie the assertion. This conduct, if it occurred, would only raise suspicions that F & S may have been engaged in a tentative attempt to unilaterally restructure the original transactions. Viewed in the most favorable light for

plaintiffs, the evidence shows F & S unconditionally promised to repay the sums advanced, plus additional money in like amounts.

While the parties may claim that an intent to violate the statute was absent, we experience no difficulty in finding a necessary intent. The requisite showing in this situation is not proof of a willful design to violate the statute as such. The applicable test is whether the agreement, if performed according to its terms, would produce a higher rate of interest than allowed by law for the lender, and whether such result was intended. *American Acceptance Corp. v. Schoenthaler*, 391 F.2d 64, 73 (5th Cir. 1968), *cert. denied*, 392 U.S. 928 (1968); *Britz v. Kinsvater, supra*, 87 Ariz. at 393, 351 P.2d at 991; *Liebergesell v. Evans, supra*, 23 Wash. App. at 362, 597 P.2d at 911; *Tacoma Commercial Bank v. Elmore*, 18 Wash. App. 775, 780, 573 P.2d 798, 801 (1977). *Contra, Stewart v. Nangle*, 103 So.2d 649 (Fla. App. 1958) (construing a usury statute requiring "willfulness"). As plaintiffs sought to exact a one hundred per cent return, all elements of transactions tainted by usury are bared by the record.[10]

Taking the evidence in the most favorable light for plaintiffs and judging it against applicable principles of law, there is only room for a conclusion that the transactions were usurious loans.

IV.

F & S moved for a directed verdict at the close of plaintiffs' case and again at the close of all evidence. It also sought a judgment notwithstanding the verdict after the special verdicts were returned. For reasons stated earlier, the trial court clearly erred by not granting the motion for directed verdict at the close of all evidence as it was apparent by then, if not at

[10] We do not mean to imply that every contract calling for a return of more than the advanced sum plus legal interest is usurious. *See* Annot., 16 A.L.R.3d 475, for cases where joint venture agreements involving the payment of sums in addition to legal interest have been deemed legally enforceable.

the close of plaintiffs' evidence, that there was no real issue of fact for the jury. *Tsugawa v. Reinartz*, 56 Haw. 67, 71, 527 P.2d 1278, 1281-82 (1974); *DePonte v. Ulupalakua Ranch, Ltd.*, 48 Haw. 17, 21, 395 P.2d 273, 275 (1964). The transactions were tainted by usury as a matter of law. This renders a consideration of the questions on the admissibility of the depositions and their availability to the jury during deliberations unnecessary.[11] The same may be said for the issues pertaining to the part of the judgment against Dang and Yamamoto premised on the special verdicts that there was no agreement between F & S and Dang and that there was an accord and satisfaction between F & S and Yamamoto.

With respect to the contention that the trial court erred in admitting testimony to the effect that someone not a party to the suit loaned money to F & S to partly finance the construction, we find this did "not affect the substantial rights" of plaintiffs. Rule 61, H.R.C.P. There was more than ample evidence, even without the foregoing testimony, manifesting the true nature of the agreements in question. Any error here, if committed, was harmless. *Sherry v. Asing*, 56 Haw. 135, 158-59, 531 P.2d 648, 664 (1975); *Kometani v. Heath*, 50 Haw. 89, 92, 431 P.2d 931, 934 (1967).

We reverse that part of the judgment against F & S and affirm that part of the judgment against Dang and Yamamoto. The case is remanded for the entry of an appropriate judgment consistent with this opinion.

*William F. Crockett (Crockett & Nakamura* of counsel) for defendant-appellant, cross-appellee and defendant.

*Robert E. Rowland (Case, Kay & Lynch* of counsel) for plaintiffs-cross-appellants and plaintiffs-appellees.

[11] Plaintiffs' pre-trial depositions were admitted as defendants' exhibits at the close of defendants' case on representations that they contained relevant evidence. Plaintiffs objected to the admission of the entire depositions without the citation or the reading of specific portions considered relevant by defendants, but were overruled. However, the record fails to show the trial court read the depositions.