In the Matter of the Application of HAWAIIAN TELEPHONE COMPANY For Authority to Increase Certain Rates and Charges for Telephone Service to Offset Increased Labor Costs

NO. 6943

(DOCKET NO. 2585)

SEPTEMBER 29, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ.,
AND RETIRED JUSTICES OGATA AND MENOR
ASSIGNED TEMPORARILY

OPINION OF THE COURT BY LUM, J.

This is an appeal by the Statewide Telephone Users Committee ("STUC") and the Public Utilities Division of the Department of Regulatory Agencies ("PUD") from Decision and Order No. 4983 of the Public Utilities Commission of the State of Hawaii ("PUC") which

granted the Hawaiian Telephone Company ("HTC") its requested intrastate telephone rate increase of $10,655,000 per year, effective February 1, 1978. Having determined that appellants have failed to carry their burden of proving that the findings of the PUC were clearly erroneous or that the Decision and Order issued was unjust and unreasonable in its consequences, we affirm.

I.

Appellee HTC, a public utility engaged in the business of providing telephone and other communication services throughout the state, filed an application on January 3, 1975 with the PUC requesting approval of a proposed intrastate telephone rate increase of $10,655,000 per year in additional annual revenue. HTC's initial justification for the proposed rate increase was its rising labor costs, which included increased employee benefits and associated payroll and public utility taxes resulting from recent labor negotiations with its employees' union.

Numerous public hearings and prehearing conferences were held by the PUC on HTC's proposed rate increase. The PUC issued prehearing orders establishing timetables for the submission of evidence and limiting the issues to be discussed.

A series of economic evidentiary hearings were then held to determine whether HTC was entitled to the requested rate increase on its intrastate rate base. The evidentiary hearings were not limited only to the issue of expenses and labor costs, as HTC had originally intended, but included all elements of a comprehensive rate case, such as evidence on rate base, rate of return, revenue and separations procedure, based on the selected test year of 1976. In accordance with PUC's Proposed Decision and Order No. 4954, HTC submitted intrastate rate base and expense figures using the Hawaiian Plan II separations procedure, as well as a proposed rate schedule, which it subsequently revised.

On January 20, 1978, the PUC issued its Final Decision and Order No. 4983, which granted HTC its requested annual rate increase, effective February 1, 1978. The rate increase of $10,655,000 per year in additional annual sales revenue equalled a 7.05% rate of return on the intrastate rate base of $305,251,000 for the test year of 1976. The PUC found that the authorized rate

increase would be just, reasonable and non-discriminatory and would produce a fair rate of return on an intrastate rate base used or useful for public utility purposes within the state. Appellants STUC and PUD, both of whom opposed the proposed rate increase at the evidentiary hearings, appeal Decision and Order No. 4983 on procedural and substantive grounds.

## II.

We note at the outset, as we have before, that once the PUC has made a final decision and order, the order carries a presumption of validity. Those seeking to upset the PUC's decision and order have "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944) *quoted in Jones v. Hawaiian Electric Co.*, 64 Haw. 289, 639 P.2d 1103, 1107 (1982); *In re Hawaii Electric Light Co.*, 60 Haw. 625, 630, 594 P.2d 612, 617 (1979); *In re Kauai Electric Division of Citizens Utilities Company*, 60 Haw. 166, 187, 590 P.2d 524, 538 (1978).

Our scope of review in this appeal is therefore limited. In accordance with the relevant provisions of the Hawaii Administrative Procedure Act, PUC's "findings, conclusions, decisions, or orders" will not be disturbed upon judicial review unless "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." HRS § 91-14(g)(5) (1976).

## III.

### RATE BASE

Appellants' principal contention on appeal is that there was no reliable, probative or substantial evidence to support the PUC's findings with regard to HTC's rate base, which appellants allege was not proven to be reasonably valued or actually used or useful for public utility purposes. Specifically, appellants are concerned with the accuracy of HTC's plant-in-service figures, an essential component of the rate base which reflects the cost evaluation of the physical property of HTC actually used in telephone service.

HRS § 269-16(b) (1976) provides in relevant part that a public

utility is entitled to "a fair return on the property of the utility actually used or useful for public utility purposes." The determination of a proper rate base thus entails a valuation of the property of the utility devoted to public utility purposes on which the public utility is allowed to earn an appropriate rate of return. *See In re Kauai Electric Division of Citizens Utilities Company, supra* at 188-89, 590 P.2d at 538; *Honolulu Gas Co. v. PUC,* 33 Haw. 487, 521-22 (1935).

PUC estimated HTC's average depreciated rate base for the test year of 1976 as $423,438,000 for the total company and $305,251,000 for intrastate operations in particular. These rate base figures were computed by taking the total plant-in-service estimate of $587,729,000 in addition to short-term assets such as material and supplies and working cash, less appropriate deductions such as accumulated depreciation, deferred income taxes, aid to construction and unamortized investment credit. PUC required that total telephone property, revenues and expenses be apportioned between intrastate and other operations by the use of the Hawaiian Plan II separations procedure.

### A. METHOD OF VALUATION

HTC used the original cost method of computing its rate base, a regulatory method that has been consistently utilized by the PUC since 1948. Under this method, the rate base equals the cost of the original investment in the utility plant devoted to public service less accrued depreciation.

The original cost method of valuation is one of three major valuation methods currently recognized in public utility regulation. Another method of rate base valuation is to calculate the "reproduction cost" of the existing plant at current prices for material and labor. The third method involves computing the "fair value" of the property being used in public service by taking into consideration various factors such as original and reproduction cost of construction, operating expenses, cost of permanent improvements, and the cost and market value of the utility's stocks and bonds. *See* Nichols and Fields, *Rate Base under PURA: How Firm a Foundation,* 28 Baylor L. Rev. 861 (1976); Rose, *Confusion in Valuation for Public Utility Rate-Making,* 47 Minn. L. Rev. 1 (1962).

Appellant STUC contends that HTC failed to prove that the

original cost method of computing the rate base utilized in this case was reasonable. STUC argues that alternative methods of valuation should have been considered by the PUC.

Any of the recognized methods of valuation may be utilized to determine the rate base, as long as the selected method does not result in an arbitrary or unreasonable rate. *See Federal Power Commission v. Hope Natural Gas Co., supra* at 602. As we stated earlier in *In re Kauai Electric Division of Citizens Utilities Company, supra* at 188, 590 P.2d at 538, "no one formula or set of formulas for determining a rate base can be considered exclusive. Each case necessarily depends on its particular facts." In that decision, we noted that the original cost method of plant valuation has been recognized by some commentators as the most equitable rate base valuation in the viewpoint of the consumer as well as the utility. We concluded that the PUC's use of the original cost method was not unreasonable under the circumstances of that case.

In its Final Decision and Order, PUC considered and rejected STUC's assertion that "fair value" or "reproduction cost" methods of valuation would provide a more equitable rate base than the original cost method. The PUC noted that Hawaii is in accordance with the majority of jurisdictions in using the original cost method of valuating the rate base. *See also* Rose, *Confusion in Valuation for Public Utility Rate-Making,* 47 Minn. L. Rev. 1, 3 (1972); Webb, *Utility Rate Base Valuation in an Inflationary Economy,* 28 Baylor L. Rev. 823, 827 (1976).

The PUC also referred to its decision in *In re Hawaiian Telephone Co.,* 34 PUR.3d 556, 565 (1960) where it had rejected the fair value rate base method as "unstable," "speculative," and "undesirable to the utility interest, as represented by both the stock and bondholders, as it is to the customers of a utility." Moreover, PUC found that because of inflationary factors since World War II, a reproduction cost method in the present case would yield a far higher rate than the original cost method utilized by HTC.

It is within the agency's discretion to choose the particular method of valuation to be utilized in a certain case. The courts will not substitute their judgment for the agency's in the absence of a clear abuse of that discretion. *See Federal Power Commission v. Hope Natural Gas Co., supra* at 602; *Federal Power Commission v. Natural Gas Pipeline Co.,* 315 U.S. 575, 586 (1941); *In re Kauai Electric Division of*

*Citizens Utilities Company, supra* at 188-89, 590 P.2d at 538; *In re Application of Hawaiian Electric,* 42 Haw. 233, 238-45 (1957).

Upon examining the PUC's reasons for rejecting alternative methods of rate base valuation, we cannot conclude that the PUC abused its discretion in utilizing the original cost method of valuating the rate base in this particular case.

## B. PLANT-IN-SERVICE

In calculating its original cost rate base, HTC relied on its telephone plant-in-service accounts kept in accordance with the Uniform System of Accounts, 47 C.F.R. §§ 31.01-1 - 31.8 (1981). By definition, the telephone plant-in-service accounts in the Uniform System of Accounts include "the original cost of the company's property used in telephone service at the date of the balance sheet." 47 C.F.R. § 31.100:1. HTC's compliance with the Uniform System of Accounts is required by the Federal Communications Commission ("FCC"), pursuant to its authority under 47 U.S.C.A. § 220(a) (1934), as well as the PUC, by Commission Order No. 284 filed on December 13, 1937.

The final revised plant-in-service estimate that HTC submitted to the PUC on February 9, 1976 included figures taken from HTC's plant-in-service accounts through December 31, 1975, plus estimated additions for 1976. HTC represented its total company plant-in-service as $587,729,000 and its intrastate plant-in-service as $423,438,000 for test year 1976.

After examining the evidence, the PUC concluded that HTC had established a prima facie case that its plant-in-service was used or useful for public utility purposes. In its Final Decision and Order, the PUC accepted the telephone plant-in-service accounts and the estimated additions for 1976 prepared by HTC in the ordinary course of business as evidence of the original cost of the company's physical property in telephone service. PUD and STUC did not present any evidence at the hearings to disprove HTC's prima facie case regarding the actual use or usefulness of the plant-in-service and did not challenge any specific item in HTC's plant-in-service accounts. The PUC noted that the PUD in particular, as a regulatory agency, had ample opportunity to examine HTC's accounts to determine whether the plant-in-service was used or useful for public

utility purposes. PUC also noted that since HTC's plant-in-service was so large, it was impractical to require HTC to submit evidence on each item in the plant-in-service accounts, especially since every expenditure over $500,000 had already been approved by the PUC as required under PUC regulations.

Both appellants contend that PUC erred in its findings that HTC's plant-in-service was (1) reasonably valued and (2) used or useful for public utility purposes. Appellant PUD argues that HTC failed to explain the substantial increase in plant-in-service from 1970 to 1976 and failed to introduce evidence concerning the reasonableness of the acquisitions which caused the increase. PUD further argues that just because a plant is "in service" does not necessarily mean that the plant is used or useful for public utility purposes. Appellant STUC contends that HTC did not prove that its purchases of equipment from its affiliate, Automatic Electric, were prudent investments. STUC also complains that PUC did not give adequate consideration to comparative data submitted by STUC which contrasted the plant-in-service of General Telephone of California, which has five times the number of telephones as HTC, and the plant-in-service of HTC, which STUC argues should necessarily be only one-fifth the size of the California telephone company's accounts. Both appellants question the use of HTC's book value of its telephone plant-in-service as an accurate estimate of the company's investments in public utility service.

In jurisdictions that use the original cost valuation method of ascertaining the rate base, book value is often used to represent the investment cost of the public utility's physical plant. *See, e.g., Re Piedmont Natural Gas Co.,* 34 PUR.3d 1 (N.C. 1960); *Re South Carolina Electric & Gas Co.,* 34 PUR 4th 458 (S.C. 1980); *Re Northwestern Bell Telephone Co.,* 100 PUR. N.S. 221 (S.D. 1953); *Re Wisconsin Southern Gas Co.,* 81 PUR. N.S. 268 (Wis. 1949). The cases cited by STUC in support of the contrary proposition that accounting records cannot be accepted as evidence of the value of the rate base are primarily from jurisdictions that utilize the alternative fair value method of rate base valuation, rather than the original cost method utilized by HTC and the majority of jurisdictions.

Book valuation of original cost has the advantages of administrative convenience, speed and simplicity. *See* A. Priest, 1 Principles of Public Utility Regulation, 139-41 (1969). If records are accurately

kept, they may furnish probative evidence of the investment value of the public utility plant. *See West Ohio Gas Co. v. Public Utilities Commission of Ohio,* 294 U.S. 63, 73 (1935); *United Fuel Gas Co. v. Railroad Commission,* 278 U.S. 300, 318 (1928); *Newton v. Consolidated Gas Co. of New York,* 258 U.S. 165, 176 (1922).

Books kept in accordance with the Uniform System of Accounts have significant probative value in rate proceedings. The FCC regulations pertaining to the Uniform System of Accounts for Class A and B telephone companies require that the telephone company records "be kept with sufficient particularity to show fully the facts pertaining to all entries in these accounts" and that "[a]ll charges to the accounts prescribed in this system of accounts for telephone plant, income, operating revenues, and operating expenses, shall be just and reasonable." 47 C.F.R. §§ 31.01-2(a), (c).[1] Persons who willfully make any false entry or who willfully neglect to make full, true, and correct entries in the accounts are subject to criminal and civil penalties provided in the Federal Communications Act of 1934, 47 U.S.C. § 220(e). A telephone company's compliance with the Uniform System of Accounts under the supervision of the FCC and state regulatory agencies provides substantial assurance that company records will be an accurate reflection of the true value of the utility's depreciated original cost.

A telephone company's compliance with the Uniform System of Accounts also provides substantial assurance that the plant-in-service accounts will represent telephone plants that meet the statutory requirement that the rate base include only "property of the utility actually used *or* useful for public utility purposes." HRS § 269-16(b) (emphasis added). By definition, under the FCC regulations, the telephone plant-in-service accounts must include the original cost of the telephone plant actually "used in telephone service." 47 C.F.R. § 31.100:1. *See also* 47 C.F.R. § 31.01-3(ii). Unless there is evidence that HTC failed to comply with the Uniform System of Accounts or included any item in its accounts which was not actually used or useful for public utility purposes, PUC's accep-

---

[1] HTC as a class A company, having annual operating revenues exceeding $250,000, is required to keep all the accounts of the Uniform System of Accounts which are applicable to its affairs. 47 C.F.R. §§ 31.01-1(a), (b).

tance of HTC's records as evidence of the value of HTC's plant-in-service cannot be deemed unreasonable.

The evidence produced at the rate hearings supported HTC's assertions that its records were kept in strict compliance with the FCC's Uniform System of Accounts and that the records represent an accurate valuation of HTC's plant-in-service. In the hearings, Mr. Robert Tom, Vice-President-Secretary-Treasurer of HTC, testified that the rate base figures used as estimates of depreciated original cost of the utility plant were taken from HTC accounts maintained in accordance with the Uniform System of Accounts. Mr. Tom also stated that to the best of his knowledge, the plant-in-service accounts represent plants that are actually in service. Under cross-examination by STUC, Mr. Tom admitted that HTC's purchases of equipment from an affiliate, Automatic Electric, were not done on a competitive basis, but he stated that in the opinion of management, prices were fair and reasonable and compared favorably with prices of nonaffiliated companies.

STUC and PUD, as appellants seeking to overturn the PUC's order, have the heavy burden of showing by clear and convincing evidence that the PUC's acceptance of HTC's plant-in-service accounts was unreasonable or unjust. *See Jones v. Hawaiian Electric Co., supra* at 292, 639 P.2d at 1107; *In re Hawaii Electric Light Co., supra* at 630, 594 P.2d at 617; *In re Kauai Electric Division of Citizens Utilities Company, supra* at 187, 590 P.2d at 538. PUD and STUC, however, have not presented any evidence contradicting the accuracy of HTC's plant-in-service accounts nor are they able to point to any specific item in the accounts as being unreasonably valued or over-inflated.

STUC's general assertion that HTC's plant-in-service accounts compare unfavorably with those of General Telephone of California was properly rejected by the PUC. STUC presented no evidence that the physical characteristics or cost conditions between the two companies were essentially similar, which are mandatory prerequisites for a cost comparison of this nature. *See Re Mystic Valley Water Co.*, 23 PUR. N.S. 19 (Conn. 1938); *Re Durham Telephone Co.*, 14 PUR.3d 57 (N.C. 1956); *Arlington County Board of Supervisors v. Virginia Electric & Power Co.*, 196 Va. 1102, 87 S.E.2d 139, 151 (1955).

STUC's contention that HTC's affiliation with Automatic Electric, which like HTC is a subsidiary of General Telephone & Elec-

tronics Corporation, was also properly rejected by the PUC.[2] *See Re General Telephone Co. of Florida,* 34 PUR. 4th 356 (Fla. 1979); *Public Service Commission v. Southwestern Bell Telephone Co.,* 57 PUR. N.S. 257 (Mo. 1945); *Public Utility Commission v. Bell Telephone Co.,* 81 PUR. N.S. 316 (Pa. 1949). The mere fact that HTC and Automatic Electric have common corporate parentage "does not in and of itself constitute a badge of fraud or prove prima facie that the use of intercompany price quotations has resulted in a distorted or inflated appraisal." *PUC v. Southwestern Bell Telephone, supra* at 295. There was no evidence in the record to indicate that Automatic Electric's prices for equipment were unreasonably higher than the price charged by nonaffiliates. In fact, from the evidence submitted by HTC on this issue, the PUC could have reasonably concluded that the price paid for the equipment purchased by HTC compared favorably with the prices charged by other companies.[3]

Appellants PUD and STUC have failed to demonstrate by clear and convincing evidence that the PUC's findings with regard to HTC's plant-in-service were clearly erroneous or unsupported by the record. Simply because appellants would have chosen a different methodology for valuating its plant-in-service does not prove that there was a fatal defect in the PUC's decision and order. On the evidence presented, we cannot say that the PUC committed reversible error in concluding that HTC's plant-in-service was used or useful for public utility purposes.

## IV.

Appellant PUD's final contention on appeal is that the PUC erred in admitting HTC's Exhibit 23 into evidence and in accepting HTC's mathematical calculations of its intrastate rate base and expense figures because these submissions had not been subject to cross-examination or rebuttal testimony by PUD at the evidentiary

---

[2] HTC's affiliation with General Telephone & Electronics Corporation was approved by the PUC by Decision and Order No. 1939, filed April 25, 1967.

[3] HTC's price comparison study showed that Automatic Electric's prices were lower than those charged by nonaffiliated companies for the majority of the items studied.

hearings, in violation of HRS § 91-10(3) (1976). PUD also argues that HTC failed to establish that Exhibit 23 was relevant, material, and not unduly repetitious, which PUD contends is required by HRS § 91-10(1) (1976). PUD further alleges that HTC made several technical errors in its intrastate rate base calculations.

Exhibit 23 was submitted by HTC on January 13, 1977 near the close of the economic evidentiary hearings. It consists of all of HTC's responses to PUD's numerous informational requests, excluding IR responses 900, 901, 902, 1003, which had been previously marked as exhibits. Exhibit 23 comprises several volumes of several thousand pages.

PUD now contends that the very informational responses it requested of HTC was not proven by HTC to be relevant, material and not unduly repetitious. PUD argues that the admission of Exhibit 23 into evidence thus violates HRS § 91-10(1) which states that

> Any oral or documentary evidence may be received, but every agency shall as a matter of policy provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence and no sanction shall be imposed or rule or order be issued except upon consideration of the whole record or such portions thereof as may be cited by any party and as supported by and in accordance with the reliable, probative, and substantial evidence. The agencies shall give effect to the rules of privilege recognized by law.

In *Cazimero v. Kohala Sugar Co.*, 54 Haw. 479, 482-84, 510 P.2d 89, 92-93 (1973), we held that the first eight words of HRS § 91-10(1), *i.e.* "[a]ny oral or documentary evidence may be received," should be liberally construed. We further stated that

> [W]hen an agency is faced with evidence of doubtful admissibility, it is preferable that it allow the admission of such evidence rather than to exclude the same, for the very practical reason stated in *Donnelly Garment Co. v. National Labor Relations Board*, 123 F.2d 215, 224 (8th Cir. 1941), as follows: "If the record on review contains not only all evidence which was clearly admissible, but also all evidence of doubtful admissibility, the court which is called upon to review the case can usually make an end of it, whereas if evidence was excluded which that court regards as having been admissible, a new trial or rehearing cannot be avoided." *See also* 3 Larson, Workmen's Compensation Law § 79.10 (1971).

Since HRS § 91-10(1) as interpreted by this Court favors the liberal admission of evidence, the admission of Exhibit 23 into evidence cannot be held to have violated HRS § 91-10(1) absent some showing by PUD that the evidence was irrelevant, immaterial or unduly repetitious. *See Shorba v. Board of Education,* 59 Haw. 388, 397, 583 P.2d 313, 319 (1978). PUD has not cited any particular section of Exhibit 23 which renders it inadmissible on these grounds. We thus hold that the PUC did not commit reversible error in failing to exclude Exhibit 23 under HRS § 91-10(1).

PUD also complains that since Exhibit 23 was admitted near the close of the evidentiary hearings, PUD did not have the opportunity to cross-examine the sponsor of the exhibit or offer rebuttal testimony. PUD contends that it was thus denied its procedural rights under HRS § 91-10(3) (1976) which states that

Every party shall have the right to conduct such cross-examination as may be required for a full and true disclosure of the facts, and shall have the right to submit rebuttal evidence.

HTC's position is that PUD waived its procedural rights of cross-examination and rebuttal when PUD agreed to PUC's Pre-hearing Order 4148 which stated in relevant part that

Responses to the information requests of any party may be introduced into evidence subject to objections as to the relevancy and materiality of the offered material or whether the material or any portion thereof is privileged.

HTC contends that the agreement amounted to a stipulation to waive the right to cross-examine and offer rebuttal evidence under HRS § 91-9(d) (1976) which states that

Any procedure in a contested case may be modified or waived by stipulation of the parties and informal disposition may be made of any contested case by stipulation, agreed settlement, consent order, or default.

Moreover, HTC notes that at the time it introduced Exhibit 23, it offered to call any HTC employee who participated in the exhibit's preparation to testify as to the substance of the exhibit, but PUD did not act on HTC's offer. HTC further points out that since Exhibit 23 consisted of HTC's responses to PUD's own informational requests, PUD must have been aware of the subject matter of its own informational requests and could have cross-examined HTC witnesses and offered rebuttal evidence on the subject matter during the eviden-

tiary hearings.

HTC's points are well taken. But even assuming arguendo that the admission of Exhibit 23 could be construed as error, it nevertheless does not constitute reversible error. As we noted in *Associated Engineers & Contractors v. State,* 58 Haw. 187, 213, 567 P.2d 397, 414, *reh. denied,* 58 Haw. 322, 568 P.2d 512 (1977), this Court will not reverse a trial court's decision on the basis of the admission of incompetent evidence unless (1) all of the competent evidence is insufficient to support the judgment or (2) it appears that if the trial court had not considered incompetent evidence, it would have decided otherwise. *See also Lennen & Newell v. Clark Enterprises,* 51 Haw. 233, 238, 456 P.2d 231, 235 (1969).

PUD has not shown that Decision and Order No. 4983 was based in any part on the PUC's consideration of Exhibit 23. There was sufficient competent evidence in the record other than Exhibit 23 to support the PUC's decision. *See Dang v. F and S Land Development Corp.,* 62 Haw. 583, 593, 618 P.2d 276, 282-83 (1980); *Sherry v. Asing,* 56 Haw. 135, 158-59, 531 P.2d 648, 664 (1975); *Kometani v. Heath,* 50 Haw. 89, 92, 431 P.2d 931, 934 (1967). On the evidence presented, we hold that the admission of Exhibit 23 at the close of the evidentiary hearings did not constitute reversible error.

The same reasoning holds true for the PUC's acceptance of HTC's mathematical calculations of its intrastate expense and rate base figures and the rate schedule incorporated in Decision and Order No. 4983.

On December 16, 1977 HTC submitted its calculations of its intrastate rate base and certain expense items along with a rate schedule in compliance with the PUC's Proposed Decision and Order No. 4954 filed on December 9, 1977 which stated in part that

HTC shall compute the intrastate operating results at present rates by applying the Hawaiian Plan II separations procedure to the total company results of operation shown on Exhibit B, attached hereto. HTC shall also submit the computations or the worksheets of the intrastate results of operation at present rates. The computations shall be submitted to the Commission by December 16, 1977. A copy of the computations shall be submitted to the PUD and STUC with proof of service attached to the original.

On January 18, 1978, HTC submitted a revised rate schedule which

included an additional six pages that had been inadvertently omitted from the December 16, 1977 submission. The additional six pages consisted of information that had already been included in Exhibit 23.

These calculations were not evidence as such but only computations made by HTC at the PUC's behest, according to the PUC's directions. It was not unreasonable for the PUC to make such a request, considering that HTC had the resources and manpower at its disposal to make these complicated calculations. In view of the reliable, probative and substantial evidence on the whole record, we do not find that the PUC's acceptance of these calculations was clearly erroneous under HRS § 91-14(g)(5).

Affirmed.

*Ronald Shigekane (Barry M. Utsumi* on the briefs), Deputy Attorneys General, for appellant Public Utilities Division, Department of Regulatory Agencies.

*R. Patrick Jaress (Linda M. Katsuki* with him on the brief, *Mukai, Ichiki, Raffetto & MacMillan* of counsel) for appellant Statewide Telephone Users Committee.

*Marshall M. Goodsill (Thomas W. Williams, Jr.,* with him on the briefs, *Goodsill, Anderson & Quinn* of counsel) for appellee Hawaiian Telephone Co.