SURVIVORS OF TIMOTHY FREITAS, DEC., Claimant-Appellee, *v.* PACIFIC CONTRACTORS COMPANY, Employer-Appellant, and HAWAIIAN INS. AND GUARANTY CO., LTD., Insurance Carrier-Appellant

NO. 6517

JUNE 30, 1980

HAYASHI, C.J., BURNS, J., CIRCUIT JUDGE GREIG
IN PLACE OF ASSOCIATE JUDGE PADGETT, DISQUALIFIED

OPINION OF THE COURT BY BURNS, J.

This is an unusual workers' compensation case.

Survivors (herein appellees) did not seek compensation under the Workers' Compensation Act, chapter 386, Hawaii Revised Statutes. The Department of Labor and Industrial Relations initiated an investigation pursuant to its authority under section 386-71, Hawaii Revised Statutes, after receiving a report of the accident from the employer. The Director ruled that the decedent was in the employ of Pacific Contractors on the date of his fatal accident and that the accident arose out of and in the course of his employment. Survivors appealed this decision to the Labor and Industrial Relations Appeals Board which then held a full hearing de novo pursuant to section 386-87(b), Hawaii Revised Statutes.

The Appeals Board ruled that decedent's fatal accident was not compensable under the Workers' Compensation Act, chapter 386, Hawaii Revised Statutes. The Board ruled that decedent was still an employee at the time of his fatal accident but that the accident did not arise out of and in the course of employment.

Employer and Insurance Carrier (hereinafter appellants) appeal from the Board's Decision and Order. We affirm.

The Board made the following findings of fact:

1. On October 18, 1973, Timothy Freitas (hereinafter Decedent) suffered a fatal accident when a dump truck being operated on a Pacific Contractors' (hereinafter Employer) project turned over, pinning him beneath the truck bed.

2. Decedent had begun work in September 1973 with the Employer as an apprentice in a regular apprenticeship program.

3. During the time Decedent worked for Employer, the Employer was engaged in two projects separated by only a few miles. One project was commonly referred to as the Wailea Project and the other was called the Waimahaihai Project.

4. Each project was managed by a Superintendent and each Superintendent had the authority and responsi-

bility for directing the personnel assigned to his project including considerable responsibility for hiring personnel, assigning them work tasks to be accomplished, and terminating their employment.

5. At least in the case of terminating apprentices, the Superintendents felt it necessary to get the prior approval of the President of Pacific Contractors.

6. Employees generally were assigned to a specific project — either Wailea or Waimahaihai. Because both projects were Pacific Contractors' projects there was some interchange of personnel from project to project as conditions warranted.

7. When first hired, Decedent was assigned to the Wailea project. In the latter part of September, 1973, Decedent was transferred to the Waimahaihai project.

8. The Waimahaihai Superintendent was dissatisfied with Decedent's work performance and on October 16, 1973 informed Decedent he was going to be terminated from the Employer's employment. He sent the Decedent home with instructions not to return to work on the Waimahaihai project.

9. Decedent had expressed an interest in becoming a truck driver and discontinuing the apprenticeship program.

10. On the morning of October 17, 1973, Decedent reported to the Wailea project and was assigned work on that project by the Wailea Superintendent. Decedent worked a full day on October 17, 1973 at the Wailea project.

11. On the afternoon of October 17, 1973 the Waimahaihai Superintendent visited Decedent on the Wailea project to give him a second chance to continue in the apprenticeship program. Decedent refused, persisting in his desire to become a truck driver. The Waimahaihai Superintendent then repeated that Decedent was to be terminated from the Employer's employment.

12. Shortly before 7:00 a.m. on October 18, 1973, Decedent reported to the Wailea project accompanied by

his brother who was also an employee at the project. At the Board hearing on August 11 and 12, 1975, Decedent's brother testified that Decedent reported to the project for the sole purpose of inquiring about a job as a truck driver. The brother further testified that Decedent had no intention of working at either the Wailea or Waimahahai [sic] project on October 18, 1973.

13. The Wailea Superintendent had expected Decedent to work on the Wailea project on October 18, 1973 but in the discussion with Decedent and his brother prior to 7:00 a.m. that day, understood that Decedent had "patched up" things with the Waimahaihai Superintendent. The Wailea Superintendent therefore assumed Decedent would work at Waimahaihai on October 18, 1973.

14. The Wailea Superintendent was the only person with authority to assign Decedent to a job on the project. He testified he did not assign Decedent any job on the project on October 18, 1973. However, he further testified that he could have used Decedent on the project on October 18 and would have assigned him to work with his brother again.

15. When Decedent expressed interest in becoming a truck driver, the Wailea Superintendent told him he was busy and they would have to discuss the subject later. The Wailea Superintendent testified at the hearing that he assumed the subject would be discussed later that day; possibly at noon when Decedent might come back to the Wailea site.

16. Decedent's brother testified that he and Decedent thought the Wailea Superintendent meant for Decedent to wait by the site where the brother was working and the Superintendent would join Decedent there when he had time.

17. The Waimahaihai Superintendent did not expect Decedent to appear for work at that project on October 18, 1973, believing Decedent, if not terminated from employment, was in the process of being terminated from employment with the Employer.

18. The Waimahaihai Project Superintendent testified that termination of Decedent required the approval of the President of the company because of the latter's special interest in the apprentice program and because there was a possible difference of opinion between the two Project Superintendents as to the termination and such a difference of opinion should be resolved by the President. Once the President approved termination, the Waimahaihai Project Superintendent testified he planned to complete the necessary paperwork and to call the company's Honolulu office to arrange for a final paycheck for Decedent. The termination papers and final paycheck would have been given to Decedent on the regular Friday payday of October 19th, the day following the date of the accident.

19. Decedent spent the early morning work hours of October 18, 1973 waiting at his brother's work site for the Wailea Superintendent. Both the brother and another apprentice working at the site testified that Decedent did no work the morning of October 18, 1973.

20. While waiting at the brother's work site, the truck involved in the fatal accident stopped and Decedent entered the truck for the express purpose of learning more about the gears and their operation as a means of furthering his ambition to become a truck driver.

21. The truck, with Decedent as a rider, proceeded to a place on the Wailea project approximately one-half mile from the site where Decedent's brother was working and it was there the accident occurred.

22. Testimony was offered at the hearing that both the Employer and the Union had a policy against unauthorized personnel riding in Employer's trucks. Authorized personnel were truck drivers and employees enroute from one point to another point in the direct conduct of their job duties. Other riders could be authorized only by the Project Superintendent and the Wailea Superintendent had not authorized the truck driver to pick up Decedent nor

authorized Decedent to seek a ride in the truck involved in the accident.

23. Decedent's apprenticeship program of heavy equipment operator did provide for training as a truck driver. However, the decision as to when an apprentice was prepared to undergo such training was up to the Project Superintendent. Both the Wailea and Waimahaihai Superintendents testified that Decedent was not ready to become a truck driver and neither Superintendent had authorized Decedent to begin the truck driver training.

24. Decedent's estate was issued a check for Decedent's earnings through October 17, 1973 shortly after the accident. Employer's records as of January 7, 1975 indicated Decedent was not credited with any work hours on October 18, 1973 and no payment for work on that date had been made to the estate.

25. On February 20, 1975, the Employer sent the estate a check for time Decedent allegedly worked on October 18, 1973.

26. On May 1, 1975, the Director of Labor and Industrial Relations, State of Hawaii, issued a Decision finding the accident compensable and ordering the payment of medical care and funeral and burial expenses. The question of death benefits were left on a "to be determined" basis.

Both parties have submitted proposed findings of fact.

The Board accepts proposed findings of fact 1-4, 7, 9, 11-20, and 22-23 and rejects proposed findings of fact 5, 6, 8, 10, and 21 submitted by Appellant. The Board accepts proposed findings of fact 1, 2, 4-7, 9-14, 16, 17, 23, and 24 and rejects proposed findings of fact 3, 8, 15, and 18-22 submitted by Employer-Appellee and Insurance Carrier-Appellee. The accepted findings of fact are incorporated herein by reference.

Appellants contend that the Board's rejection of six of Employer's proposed findings of fact was "clearly contrary" to section 91-12, Hawaii Revised Statutes, because the Board did not specifically indicate why the proposed findings were

rejected. Appellants complain that they "are forced to specu-
late" and that they are "left in total darkness" as to why the
proposed findings were rejected.[1]

_____

[1] The six proposed findings rejected by the Board are as follows:

8. Decedent and David talked to Aweau shortly before 7:00 a.m. on 10/18/73
at his office on the Wailea job site. Decedent was dressed in the type of clothing
he normally wore while working and Aweau believed he was reporting for work.
Aweau had expected to have Decedent working again with David on 10/18/73.

15. De Coite and David had been friends several years and De Coite knew of
Decedent's desire for more training as a truck driver and also remembered his
union's standing instructions that the journeymen should always help as much as
possible in the training of the apprentices. De Coite had seen Decedent working
with David earlier that morning and understood David to say it was alright with
the supervisor if De Coite took Decedent with him in the truck.

18. The training Decedent received from De Coite was part of the training
that apprentice heavy equipment operators receive on the operation of truck
tractors with multiple gears and was within the scope of Decedent's apprentice-
ship training program.

20. During the police investigation on 10/18/73 David gave Detective E.
Saffery (herein "Saffery") to understand, concerning Decedent's employment
status, "I was on the roadside working with a back-hoe . . . and brother working
within dirt road." Saffery also stated that David had told him about Decedent's
talk with Aweau that morning and he had noted, "Talked to Paul Aweau and told
to wait."

21. Decedent's alleged plan to quit, if he did not obtain a truck driver's job
from Aweau, was not put into effect on 10/18/73 because he had not told Awear "I
quit" or "I am not going to work." In fact, Decedent was still waiting to discuss
the matter with Aweau when he got into De Coite's truck to obtain training in the
use of a truck-tractor's multiple gears.

22. Contractors' procedure for terminating an employment in October 1973
included presenting the employee with the written reason for the discharge along
with the final pay check required by law. The discharge of an apprentice required
the prior specific approval of President Hardesty.

A cursory examination of the Board's own findings and the record is more than
sufficient to let the sunshine in and dispel appellants' "total darkness": The first
statement in proposed finding #8 is covered by the Board's finding #12. The last
statement in proposed finding #8 is covered by the Board's findings #12 and #13.
The statements in the middle sentence of proposed finding #8 are irrelevant in view
of the Board's findings #13 and #14, which are based on the undisputed testimony of
the Wailea Superintendent Paul Aweau.

Appellants' proposed finding #18 is covered and amplified by the Board's finding
#23.

Appellants' proposed findings #21 and #22 both relate to the issue of whether
decedent was still an employee on the date of the accident. This issue, of course, was
resolved in favor of appellants' position.

Appellants' proposed finding #15 is largely irrelevant to the factual issues which
the Board had to resolve. The allegation that De Coite had seen decedent working

In pertinent part, section 91-12, Hawaii Revised Statutes, states that:

> Every decision and order adverse to a party to the proceeding, rendered by an agency in a contested case, shall be in writing or stated in the record and shall be accompanied by separate findings of fact and conclusions of law. If any party to the proceeding has filed proposed findings of fact, the agency shall incorporate in its decision a ruling upon each proposed finding so presented.

The Board's Decision and Order dated May 21, 1976 clearly complies with the letter of the law. It does incorporate a ruling upon each proposed finding presented by both parties. Appellants cite no law for the proposition that the Board's decision must specifically state reasons for rejecting particular proposed findings of fact.

Under section 91-12, Hawaii Revised Statutes, although each proposed finding by a party must be ruled upon, a separate ruling on each proposed finding is not indispensable. *In Re Terminal Transportation, Inc.*, 54 Haw. 134, 139, 504 P.2d 1214, 1217 (1972). All that is required is that the agency incorporate its findings and rulings in its decision. *Id.* In doing so, however, the agency must make its findings and rulings reasonably clear. *Id.* The parties and the court should not be left to guess, with respect to any material question of

---

with David Freitas earlier that morning is apparently based on the following exchange between appellee's attorney and De Coite:

Q. Had you gone by the area earlier on your first dump?
A. Yeah.
Q. Had you seen David and Timothy and Alveiro [sic]?
A. Yeah, they were working with the poclain down below.
Q. Did you see what they were doing?
A. No, I didn't notice. I just — all kind of machines working.

David Freitas and Arthur Aveiro, who were working together that morning, both testified that decedent did no work whatsoever that morning. Paul Aweau, the superintendent who was the only person authorized to put decedent to work that morning, testified that he had not done so. The issue of credibility is one within the primary responsibility of the Board as the fact-finder whose determination will not be disturbed lightly. *DeVictoria v. H&K Contractors*, 56 Haw. 561, 545 P.2d 699 (1976).

The same analysis applies to appellants' proposed finding #20.

fact, or to any group of minor matters that have cumulative significance, the precise finding of the agency. *Id.*

We hold that the Board's Decision and Order complied with the applicable requirements of section 91-12, Hawaii Revised Statutes.

Appellants also contend that the Board "erroneously ignored" the presumption contained in section 386-85, Hawaii Revised Statutes:

> In any proceeding for the enforcement of a claim for compensation under this chapter, it shall be presumed, in the absence of substantial evidence to the contrary:
>
> (1) That the claim is for a covered work injury.

Appellants' contention that the Board ignored the presumption is apparently based on the fact that the decision does not specifically mention the presumption. In a rather circular argument, appellants assert that if the presumption had been applied a different result would have been reached; namely, that the fatal accident did arise out of and in the course of employment. Since this result was not reached, appellants argue, the presumption must not have been applied. We disagree.

In accordance with its responsibilities under section 91-12, the Board should generally state whether or not it has in fact applied the presumption. The Board's failure to do so in this case, however, has not prejudiced appellants' substantial rights. *See* section 91-14(g), Hawaii Revised Statutes.

Whether the presumption applies in a case in which no claim has been filed and in which it is the employer who seeks its benefit is an interesting question, but it is not a question presented by the facts of this case.

Assuming, as the appellants' assert, that the presumption applies, the issue then is whether the presumption has been rebutted by substantial evidence. *Akamine v. Hawaiian Packing*, 53 Haw. 406, 408-409, 495 P.2d 1164, 1166 (1972). Substantial evidence is "relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable man that an injury or death is not work connected". *Id.*

An injury or death is said to arise in the course of employment when it takes place within the period of the employment, at place where the employee may reasonably be, and while he is fulfilling his duties or engaged in doing something incidental thereto. 1 Larson 4-1 Law of Workmen's Compensation, § 14.00 (1980). *See Silva v. Kaiwiki Mill Co.*, 24 Haw. 324 (1918).

Paul Aweau, the superintendent of the Wailea project and the only person authorized to assign work to decedent on the date in question, unequivocally testified that he did not do so and that decedent was not subject to his control or authority. David Freitas and Arthur Aveiro, both eyewitnesses, testified that decedent performed no work whatsoever that morning. Decedent was seeking a job as a truckdriver. His work for Pacific up to the time of his death had not included any duties or responsibilities requiring him to ride on company trucks.

The Board's conclusions that decedent was not engaged in his regular employment or an employment-related activity at the time he entered the truck or at the time he was fatally injured and that the accident did not arise out of and in the course of employment are supported by substantial evidence which leaves no reasonable doubt[2] as to whether decedent's fatal accident was work connected. Therefore, assuming the presumption applies, it has been overcome.

The Decision and Order of the Appeals Board is affirmed.

*W. K. Watkins, Jr.*, for employer-appellant and insurance carrier-appellant.

*Richard L. Rost* (with him on the brief *Frank D. Padgett*, *Padgett & Rost* of counsel) for appellees.

---

[2] *See Akamine, supra,* 53 Haw. at 409, 495 P.2d at 1106.