47 P.3d 730

Bruce K. NAKAMURA, Respondent–
Appellant,

v.

STATE of Hawai'i, University of Hawai'i,
Petitioner–Appellee, Self–Insured.

No. 21978.

Supreme Court of Hawai'i.

May 23, 2002.

Roland Q.F. Thom and Laurie E. Keeno (of Char Hamilton Campbell & Thom), for petitioner-appellee, on the writ.

Bruce K. Nakamura, respondent-appellant, appearing pro se.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ. and ACOBA, J., concurring in part and dissenting in part, with whom RAMIL, J., joins.

Opinion of the Court by MOON, C.J.

Petitioner-appellee State of Hawai'i, University of Hawai'i (UH), timely petitioned this court for a writ of certiorari to review the memorandum opinion of the Intermediate Court of Appeals (ICA), vacating a decision of the Labor and Industrial Relations Appeals Board (Board) that respondent-appellant Bruce K. Nakamura was not entitled to compensation for an alleged stress-related workplace injury. *See Nakamura v. University of Hawai'i*, 95 Hawaii 243, 20 P.3d 676 (2000) (mem.) [hereinafter, ICA opinion]. In its application for a writ of certiorari, UH asserts that the ICA misinterpreted the nature of the evidence necessary to rebut a claim of compensability. We agree. Therefore, we reverse the decision of the ICA and affirm the Board's decision of non-compensability.

## I. BACKGROUND [1]

Nakamura was hired by UH to work as a painter's helper in April 1992. Nakamura initially worked on a crew supervised by Danny Chung. Nakamura apparently had trouble working under Chung and felt he was treated unfairly and discriminated against when he received an unsatisfactory job evaluation and his probation was extended. At his request, Nakamura was transferred to another work crew, supervised by Ron Yoshioka, sometime in 1993. Nakamura also had difficulties while working under Yoshioka. Nakamura complained that Yoshioka frequently swore and yelled at him, threatened him with bodily harm, taunted and berated him, and, at one time, threatened to shoot him. In or around May 1995, Nakamura was transferred to another supervisor, Henry Sakai.

Nakamura did not have any problems working under Sakai between May 1995 and September 15, 1995. However, sometime during that period, Nakamura had an unpleasant encounter with Yoshioka, during which Nakamura alleges Yoshioka threatened him. According to other UH employees who testified before the Director and the Board, Yoshioka apparently did, in fact, swear and threaten others, although the other witnesses denied any knowledge of Yoshioka threatening to shoot anyone. Sakai also testified that Yoshioka had assaulted him in the mid–1980s and that management had not followed up on his oral complaint over the incident. Also, at least one coworker testified that Nakamura would "do something else" when he was supposed to be working.

On September 15, 1995, when Nakamura collected his paycheck, he noticed that the amount of his net pay had been reduced to approximately $185, significantly less than he previously received. Although the record does not disclose Nakamura's usual net pay, his average gross salary was apparently $1,121.50 for the same time period. The reduction in Nakamura's net pay was attributable to an Internal Revenue Service (IRS) garnishment of his wages for underpayment of his federal income tax for the years 1985 through 1988. Nakamura left work and apparently has not returned.

Three days later, on September 18, 1995, Nakamura informed UH that he sustained a psychiatric stress injury at work on September 15, 1995, due to "long term inhumane treatment" and harassment by management. He claimed that UH's participation in the

---

1. The background facts are taken from the Board's findings of fact and from the record, which included, *inter alia*, notes of testimony in an administrative hearing before the Department of Labor and Industrial Relations [hereinafter, Director] and a transcript of testimony before the Board. The background facts are not disputed.

garnishment of his wages was the "straw that broke the camel's back." On September 20, Nakamura went to see his physician because he was "getting stressed out and depressed since September 15" when UH participated in the garnishment of his paycheck. He complained of fatigue, irritability, and feeling like he wanted to shoot people. He was referred the same day for emergency consultation with Annette Shimizu, Ph.D. (Dr. Shimizu), to whom he apparently described the source of his stress as "garnishing of check without approval causing stress and depression." At a subsequent appointment with Dr. Shimizu on September 28, 1995, Nakamura spoke with "pressured speech" and "related [a] detailed [history] of being treated inappropriately" at his UH job and at a former job with the federal government. Nakamura also expressed his belief that the federal government had a "conspiracy" against him. Dr. Shimizu continued to see Nakamura regularly for at least the next year or so during which period Nakamura discussed his belief that he had been harassed at work prior to September 15.

UH denied liability for Nakamura's psychological stress injury and requested a hearing with the Director to determine whether Nakamura's claim was compensable. On January 5, 1996, Nakamura was seen by Danilo Ponce, M.D. (Dr. Ponce), a psychiatrist, for an independent medical evaluation requested by UH. Dr. Ponce's report addressed several specific questions asked by the Personnel Management Office at UH. These included: (1) Dr. Ponce's diagnostic impression; (2) whether Nakamura had a pre-existing condition and, if so, the extent to which that condition contributed to his current condition; (3) whether the current condition had stabilized; (4) whether Nakamura could return to work; and (5) whether (and what, if any,) further treatment would improve Nakamura's current condition.

At the examination, Nakamura explained his belief that he had been abused, threatened, and "set up to be criticized" since the beginning of his employment with UH and that UH's collusion in the garnishment of his paycheck was the "last straw" that precipitated his injury. Nakamura stated that he was not willing to return to work unless his wages were no longer garnished and he was assigned to work elsewhere. Dr. Ponce's report also noted that Nakamura "rant[ed] and rave[d]" that the IRS could not constitutionally garnish his wages without his permission and expressed anger at UH for colluding with the IRS by participating in the garnishment. Dr. Ponce further noted that Nakamura described delusions involving the United States military using "harp vibrational technology" to control minds.

Based on a review of previous medical records, the history he obtained from Nakamura, and Dr. Ponce's own observation of Nakamura's mental status, Dr. Ponce concluded that Nakamura's diagnosis was paranoid schizophrenia, with inter-episode residual symptoms. Dr. Ponce noted that Nakamura had paranoid symptoms in 1988 while employed at Hickam Air Force Base for which he received treatment with antipsychotic medication until 1989. Dr. Ponce opined that Nakamura's pre-existing condition did not remit entirely, noting that Nakamura's complaints against his supervisors at UH were similar to work-related problems he had exhibited during his earlier employment with the federal government and that Nakamura's pre-existing condition was exacerbated by the garnishment of his wages by the IRS.[2] Dr. Ponce further recommended that, before Nakamura could return to work, he should receive antipsychotic medication and therapy to address his ongoing paranoia and hostility. Dr. Ponce did not expressly state that the exacerbation of Nakamura's illness was unrelated to Nakamura's relationship with his UH supervisors prior to the garnishment of his wages.

Prior to the hearing held by the Director, Nakamura filed a "harassment" complaint with UH Campus Security on May 31, 1996, approximately eight months after the garnishment of his wages, alleging various inci-

---

**2.** Dr. Ponce wrote that Nakamura's "complaints against the foreman at [UH] were repeats of the troubles he got into at Pearl Harbor Shipyard as well as Hickam Air Force Base and Bellows. He mentions the same pattern of abuse, verbal threats, and being 'set up.'"

dents of harassment had occurred at work during the 1992–95 period prior to the time of his wage garnishment. An internal UH investigation, which consisted of interviews of individuals who purportedly witnessed or participated in the harassment, concluded that Nakamura's specific allegations—including Nakamura's allegations that he was threatened with bodily injury—were unsubstantiated.[3]

The Director held a hearing on October 30, 1996 and denied Nakamura's claim for compensation on November 25, 1996. Nakamura appealed to the Board, which set trial for March 13, 1998.

At the trial, Dr. Shimizu agreed that Nakamura had some type of pre-existing psychiatric illness that was exacerbated by the IRS garnishment, but also testified that she believed that the UH work environment contributed to Nakamura's inability to work. She disagreed with Dr. Ponce's assessment that Nakamura had continuing psychotic symptoms. She acknowledged that Nakamura had been able to work until the garnishment occurred on September 15, 1995.

The Board concluded that the IRS garnishment was the event that triggered Nakamura's inability to work. The Board acknowledged Nakamura's relationships with his former foremen but noted that he had been able to work until September 15, 1995 and did not seek treatment for stress prior to that time. The Board credited the testimony of Drs. Ponce and Shimizu as establishing that Nakamura had some type of pre-existing illness and found, based on Dr. Ponce's report, that the pre-existing psychotic illness did not remit entirely. The Board also found that the pre-existing illness, Dr. Shimizu's initial workers' compensation reports that described the injury as related to the garnishment, and Nakamura's own statement that the garnishment was the "last straw" supported the finding that the IRS garnishment was the event that triggered Nakamura's injury. Consequently, the Board also concluded that Nakamura did not sustain an injury arising out of and in the course of his employment. Nakamura timely appealed.

On appeal, assigned to the ICA, Nakamura effectively argued that Dr. Shimizu was more credible than Dr. Ponce and that UH caused his injury by illegally garnishing his wages. As previously stated, the ICA vacated the Board's decision.

The ICA reasoned that, although Nakamura had a pre-existing illness, under *Akamine v. Hawaiian Packing and Crating Co., Ltd.*, 53 Haw. 406, 495 P.2d 1164, *reh'g denied*, 53 Haw. 592, 495 P.2d 1164 (1972), a "generalized medical opinion concerning the cause of an injury does not constitute sufficient 'substantial evidence' to rebut" the presumption present in Hawai'i workers' compensation law that a claimed injury is compensable. ICA opinion at 27. The ICA concluded that, because Dr. Ponce's report failed to expressly address whether Nakamura's purported pre-garnishment work environment in any way caused his injury, substantial evidence necessary to rebut the presumption of compensability was lacking. ICA opinion at 28–29. Relying on *Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 652, 636 P.2d 721, 727 (1981), the ICA further noted that Dr. Shimizu had opined that work stress occurring before the IRS garnishment contributed to Nakamura's post-garnishment inability to work, concluding that, "in cases where the testimony of two doctors directly conflict on the issue of an injury's causal connection to the claimant's employment activity, the legislature has determined that the conflict should be resolved in the claimant's favor." ICA opinion at 29. We granted certiorari to review the ICA's opinion.

## II. *STANDARD OF REVIEW*

Appellate review of the [Board's] decision is governed by Hawai'i Revised Statutes (HRS) § 91–14(g) (1993), which provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or

---

**3.** The report did note, however, that one person acknowledged yelling and swearing at Nakamura "a couple of times" over Nakamura's use of the telephone during work hours, incidents not identified by Nakamura as examples of harassment.

modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g). "Under HRS § 91–14(g), [COLs] are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); [FOFs] are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)."

Moreover, we have observed that:

[a]ppeals taken from [FOFs] set forth in decisions of the [Board] are reviewed under the clearly erroneous standard. Thus, the court considers whether such a finding is [c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.] The clearly erroneous standard requires the court to sustain the [Board's] findings unless the court is left with a firm and definite conviction that a mistake has been made.

A[COL] . . . is not binding on an appellate court and is freely reviewable for its correctness. Thus, the court reviews [COLs] de novo, under the right/wrong standard.

*Korsak v. Hawaii Permanente Medical Group, Inc.*, 94 Hawai'i 297, 302–03, 12 P.3d 1238, 1243–44 (2000) (citations omitted) (some brackets in original).

To the extent that the Board's decisions involve mixed questions of fact and law, they are reviewed under the clearly erroneous standard "because the conclusion is dependent upon the facts and circumstances of the particular case." *Poe v. Hawai'i Labor Relations Bd.*, 87 Hawai'i 191, 195, 953 P.2d 569, 573 (1998) (internal quotation marks and citations omitted).

## III. *DISCUSSION*

UH contends that Nakamura's inability to work was created by the IRS garnishment of his wages and, as such, is not compensable because the garnishment was not an incident of employment. *See Tate v. GTE Hawaiian Telephone Co.*, 77 Hawai'i 100, 103–04, 881 P.2d 1246, 1249–50 (1994). The garnishment clearly was not an incident of employment; thus, the ICA framed the issue as whether Nakamura's pre-garnishment employment conditions contributed in any way to his post-garnishment inability to work.[4]

When determining whether a claim is work-related, HRS § 386–85(1) (1993) states that "it shall be presumed, *in the absence of substantial evidence to the contrary* . . . [t]hat the claim is for a covered work injury. . . ." (Emphasis added.) In order to overcome the presumption of work-relatedness, the employer bears the initial burden of "going forward" with the evidence and the burden of persuasion. *See Acoustic, Insulation & Drywall, Inc. v. Labor and Indus. Relations Appeals Bd.*, 51 Haw. 312, 316, 459 P.2d 541, 544 (1969). In other words, the employer must initially introduce substantial evidence that, if true, could rebut the presumption that the injury is work-related. *See Acoustic*, 51 Haw. at 316–17, 459 P.2d at 544. In the workers' compensation context, the term "substantial evidence" "signifies a high quantum of evidence which, at the minimum, must be 'relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable

4. The record supports the conclusion that UH's participation in the garnishment of Nakamura's wages was legal and, in fact, was required by federal law. The record contains a notice of levy, which UH received from the IRS, and 26 U.S.C. § 6331 requires UH to comply with the notice. *See also Sims v. United States*, 359 U.S. 108, 79 S.Ct. 641, 3 L.Ed.2d 667 (1959) (state official personally liable to United States for refusing to comply with IRS notice of levy).

[person] that an injury or death is not work connected.' " *Flor v. Holguin,* 94 Hawai'i 70, 79, 9 P.3d 382, 391 (2000) (internal citations omitted). Once the trier of fact determines that the employer has adduced substantial evidence that could overcome the presumption, it must then weigh that evidence against the evidence presented by the claimant. *See Acoustic,* 51 Haw. at 316–17, 459 P.2d at 544; *see also Igawa v. Koa House Restaurant,* 97 Hawai'i 402, 409, 38 P.3d 570, 577, *reconsideration denied,* 97 Hawai'i 402, 38 P.3d 570 (2001). In so doing, the employer bears the burden of persuasion in which the claimant is given the benefit of the doubt. *See Akamine v. Hawaiian Packing & Crating Co.,* 53 Haw. 406, 409, 495 P.2d 1164, 1166 (1972).

> It is well established that
>
> courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field.

*Igawa,* 97 Hawai'i at 409–10, 38 P.3d at 577–78 (quoting *In re Application of Hawaiian Elec. Co., Inc.,* 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996)).

In this case, UH bore the initial burden of providing substantial evidence to rebut the presumption that Nakamura's pre-garnishment work conditions did not contribute to his post-garnishment inability to work. The evidence suggested that Nakamura had worked for over three years without seeking medical treatment for stress or without missing work due to stressful work conditions. Moreover, even if Yoshioka's behavior had contributed to some workplace stress, Nakamura did not have any problems working under Sakai, his last foreman, for the four months preceding the garnishment. Furthermore, Dr. Ponce opined that Nakamura's inability to work was due to the IRS garnishment. Dr. Ponce further opined that Nakamura's pre-garnishment employment difficulties were due to his pre-existing illness because the pattern of Nakamura's behaviors at UH was similar to those he exhibited during his earlier federal employment

when he also exhibited paranoid symptoms. Dr. Ponce's report also illustrated that Nakamura's hostility, anger, and resentment— to which he ascribed Nakamura's inability to work—was closely correlated with the IRS garnishment. Nakamura's contemporaneous initial statements to both his physician and Dr. Shimizu identified the garnishment as the source of his stress. Finally, although not specifically articulated by the Board, it appears obvious that a reasonable trier of fact could conclude from the sheer magnitude of the garnishment itself (leaving Nakamura with $185 out of gross pay of over $1,100) that such a garnishment would create psychological stress to which Nakamura's post-garnishment absence from work could be wholly attributed. Considered together, the foregoing constitutes substantial evidence that, if accepted by the trier of fact, is sufficient to rebut the presumption that Nakamura's inability to work after the date of the garnishment was related to his pre-garnishment employment conditions.

The ICA reasoned that Dr. Ponce's opinion concerning Nakamura's pre-existing condition was a "generalized medical opinion" akin to the medical testimony in *Akamine* that this court deemed insufficient to rebut the presumption of work-relatedness. In *Akamine,* the claimant died of an apparent heart attack while working at his job, which involved unloading, stacking, and "handtrucking" fifteen to twenty pounds of cargo from container trucks. *Akamine,* 53 Haw. at 415, 495 P.2d at 1165. In support of the employer's denial of the claim, one of the employer's medical experts testified that there was no connection between the claimant's death and the exertion required by his employment, relying heavily on the fact that heart disease originates early in life and that, therefore, the claimant's pre-existing condition was the sole cause of his heart attack and death. *Id.* at 410–11, 495 P.2d at 1167. This court reasoned that such "generalized" medical testimony was insufficient to rebut the presumption of work-relatedness and commented that "[t]he primary focus of the medical testimony should have been a discussion [of] whether the employment effort ... in any way aggravated" the claimant's heart condition that caused his death. *Id.* at 410–

12, 495 P.2d at 1167–68. Given the context of the foregoing statement, it is apparent the court was intending to illustrate that a reasonable degree of specificity is required in order for medical opinion evidence to rebut the presumption of compensability.

Nakamura's case is distinguishable from *Akamine* because Dr. Ponce did more than opine generally that Nakamura had an illness predating his employment with UH. Dr. Ponce identified symptoms of paranoia and accompanying behaviors attributable to Nakamura's pre-existing illness as the source of Nakamura's pre-garnishment work-related difficulties, pointing out that the behaviors were similar to difficulties that Nakamura had encountered before starting work at UH. Moreover, the paranoid thinking expressed by Nakamura during the examination with Dr. Ponce was consistent with the foregoing observation. Consequently, the evidence in support of the Board's decision was more than a mere "generalized medical opinion" concerning Nakamura's pre-existing condition.

The ICA also concluded that substantial evidence to rebut the presumption of compensability was lacking because Dr. Ponce failed to expressly write in his report that there was no connection between Nakamura's pre-garnishment work environment and Nakamura's post-garnishment inability to work. The fact that Dr. Ponce did not state formulaically that "there is no connection between Nakamura's pre-garnishment work environment and his post-garnishment injury" is not dispositive of the issue. Indeed, it would be ideal if expert medical reports and testimony utilized language that mimics the precise legal question before the Board. However, even in the absence of such language, the Board is free to draw all reasonable inferences based on the totality of the evidence presented, as long as that evidence is substantial. In our view, Dr. Ponce's opinion was specific enough to support the Board's conclusion.

In *Korsak v. Hawaiʻi Permanente Medical Group, Inc.*, 94 Hawaiʻi 297, 12 P.3d 1238 (2000), we affirmed the ICA's determination that the Board had erred in denying compensation to a claimant because "the ICA viewed the [employer's] doctors' reports as failing expressly, directly[,] and specifically to rebut the presumption" of compensability. *Id.* at 308, 12 P.3d at 1249 (emphasis deleted). Our holding in *Korsak* also refers to the degree of specificity required to adduce evidence sufficient to rebut the presumption of compensability. In *Korsak*, a claimant with a pre-existing low back condition fell in his employer's parking lot and injured his knee. *Id.* at 300, 12 P.3d at 1241. The compensability of that injury was not disputed. *Id.* While participating in physical therapy for the primary knee injury, the claimant alleged that he injured his back while performing a stretching exercise with his legs, straining his sciatic nerve. *Id.* In a proceeding to determine the compensability of the claimant's back injury—which would have been compensable if related to the physical therapy—the employer submitted the reports of two medical experts who opined that the claimant's back injury was the result of the natural progression of his pre-existing condition. *Id.* at 301, 12 P.3d at 1242. The doctors' reports focused on whether the claimant's fall contributed to his back injury but did not address whether the physical therapy session contributed to the claimant's back condition, *id.*, and we effectively reasoned that the doctor's reports were insufficiently specific to rebut the presumption of compensability. *See id.* at 308, 12 P.3d at 1249. The evidence submitted by the employer focused on the wrong incident (*i.e.*, the fall) and failed to address the obvious issue that a reasonable trier of fact would logically need to resolve: whether the stretching maneuver that strained the sciatic nerve during therapy contributed to the claimant's back condition. Although the employer's doctors did refer to another doctor's report that had, in turn, referred to the physical therapy incident, *see id.* at 302, 12 P.3d at 1243, the employer's doctors' failure to even mention such an obvious connection between the stretching exercises during physical therapy and the return of the claimant's back pain strongly suggested that they had not seriously considered it. Thus, there was no "relevant and credible" evidence by which the trier of fact, giving the benefit of the doubt to the claimant, could have concluded that the physical therapy session was

unrelated to the claimant's subsequent back pain.

■ By contrast, Dr. Ponce's report—likening Nakamura's pre-garnishment condition to his earlier employment difficulties and his statement that the garnishment was responsible for Nakamura's current difficulties—was sufficiently specific for the trier of fact to conclude that Nakamura's pre-garnishment difficulties were related to a pre-existing condition rather than the workplace environment.[5]

Finally, the ICA misapplied this court's dictum in *Chung* that, "in cases where the testimony of two doctors directly conflict on the issue of an injury's causal connection to the claimant's employment activity, the legislature has decided that the conflict should be resolved in the claimant's favor." ICA opinion at 29 (citing *Chung*, 63 Haw. at 652, 636 P.2d at 727).[6] The claimant in *Chung* was a veterinarian who had a heart attack while jogging. *See* 63 Haw. at 643–44, 636 P.2d at 722–23. One physician testified that there was a causal connection between the heart attack and the claimant's employment because the claimant's long hours and his business activities created a substantial amount of mental and emotional stress which was linked to the production of heart disease. *Id.*, 63 Haw. at 652, 636 P.2d at 727. Another physician attributed the heart attack to pre-existing atherosclerosis and physical exertion from jogging. *Id.* at 652, 636 P.2d at 727. The Board held that the injury was work-related, and this court upheld the Board's decision on the grounds that it was not clearly erroneous. *See id.* at 651–52, 636 P.2d at 727.

In *Chung*, the *only* evidence discussed was the conflicting opinion testimony of two physicians; in finding for the claimant, the Board evidently placed equal or greater weight upon the testimony presented in his favor. This court's statement concerning the evaluation of conflicting expert testimony must be viewed in that context. In other words, the statement in *Chung* that conflicting expert opinion should be resolved in favor of the claimant derives from the principle that the presumption of compensability is not rebutted when there is credible conflicting evidence as to causation that is of *equal* weight and effect. *Chung* does *not* stand for the broad proposition that the Board is mandated to reconcile conflicting expert testimony in favor of the claimant; that proposition would eviscerate the well established rule that the Board's determinations of credibility and weight are entitled to deference. *See Igawa*, 97 Hawai'i at 410, n. 7, 38 P.3d at 578, n. 7 ("*Chung* does not ... stand for the proposition that all conflicts in medical evidence should be resolved in the claimant's favor.").

■ Finally, having concluded that UH adduced substantial evidence which, if true, could rebut the presumption of compensability, we review the Board's decision in light of our deference to its role in assessing the relative credibility and weight of the evidence for and against compensability, mindful that UH bears the burden of persuasion as to which Nakamura should be given the benefit of the doubt. Although Dr. Shimizu testified that she believed that Nakamura's hostile work environment contributed to his inability to work, she never testified as to the basis of her conclusion, and her clinical notes in the record do not state the basis for her conclusion. The Board explicitly found that it believed Dr. Ponce's diagnosis. Furthermore, although Dr. Shimizu disagreed with some aspects of Dr. Ponce's diagnosis, she did agree that Nakamura had a pre-existing condition and that the IRS garnishment contributed to Nakamura's inability to work. Despite the evidence that one supervisor yelled at and threatened people and that Nakamura was bothered by an encounter he had with this supervisor sometime between May and September 1995, Nakamura's other allega-

---

5. Furthermore, in *Korsak*, as in *Akamine* and *Chung*, discussed *infra*, the medical evidence was apparently the only relevant evidence considered; here, additional evidence provided by non-experts supported the Board's decision.

6. Interestingly, the fact that the ICA viewed the reports of Dr. Shimizu and Dr. Ponce as being in "direct conflict" also reinforces our conclusion that Dr. Ponce's report was not a mere "generalized" opinion but, rather, formed a sufficiently specific basis for the Board's conclusion.

tions were not accepted as credible. Considering the foregoing in conjunction with the substantial evidence previously discussed and giving due deference to the Board's role in evaluating the weight and credibility of the evidence, *see Igawa,* 97 Hawai'i at 409–10, 38 P.3d at 577–78, we hold that the Board's decision was not clearly erroneous. *Cf. Poe,* 87 Hawai'i at 195, 953 P.2d at 573 (mixed questions of fact and law reviewed under clearly erroneous standard).

## IV. *CONCLUSION*

Because UH adduced substantial evidence to rebut the presumption of work-relatedness attributable to Nakamura's claim and giving due deference to the Board's role in evaluating the weight and credibility of the evidence, we hold that the Board's decision was not clearly erroneous. Accordingly, we reverse the ICA opinion and affirm the Board's decision denying Nakamura's workers' compensation claim.

Opinion of ACOBA, J., Concurring in Part and Dissenting in Part, with whom RAMIL, J., Joins.

While I concur in the result reached, I write separately (1) to emphasize that no "presumption of validity" standard of review applies to evaluation of witness credibility or the weight of the evidence by the Labor and Industrial Relations Appeals Board (the Board), (2) to urge that an "unjust and unreasonable" standard not be utilized in workers' compensation cases, and (3) to reiterate that review of the Board's decisions necessitates that it expressly frame its decisions in terms of the standards applicable in this area of the law.

The first standard—that a presumption of validity be given to an administrative agency decision—is wrongly utilized in some cases with reference to the Board's determination of witness credibility and the weight to be given the evidence. The second standard—that the claimant-appellant carries a heavy burden to make a convincing showing that the decision is unjust and unreasonable—is erroneously imported from utility rate-making statutes having nothing to do with workers' compensation cases. The use of these two standards in workers' compensation cases is, at its best, confusing and contradictory as to the basis for challenge and review of the Board's decisions and, at its worst, destructive of the presumption of work connectedness under Hawai'i Revised Statutes (HRS) § 386–85(1) (1993) and the clearly erroneous standard of review under HRS § 91–14(g)(5) (1993).[1] I cannot agree with the reliance on these two standards in conjunction with well-established benchmarks for review. To do so raises additional barriers for parties challenging the Board's decisions and further constricts our already limited scope of review of such decisions. The citation by the Intermediate Court of Appeals (the ICA) to such standards in its memorandum opinion is understandable, however, in light of the impreciseness of some of our past appellate decisions.

### I.

The framework for this court's review of workers' compensation decisions by the Board is well-settled. *See Igawa v. Koa House Rest.,* 97 Hawai'i 402, 411–12, 38 P.3d 570, 579–80 (2001) (Acoba, J., concurring and dissenting). In a nutshell, "HRS § 386–85(1) 'creates a presumption in favor of the claimant that the subject injury is causally related to the employment activity.' "[2] *Id.* at 411, 38 P.3d at 579 (quoting *Chung v. Animal Clinic, Inc.,* 63 Haw. 642, 650, 636 P.2d 721, 726–27 (1981) (footnote omitted)). "[T]he employer must marshal [substantial evidence] to overcome the presumption. [*See supra* note 2. This] signifies a high quantum of evidence which, at the minimum, must be relevant and credible evidence of a quality and quantity

1. *See Ras v. Hasegawa,* 53 Haw. 640, 641, 500 P.2d 746, 747 (1972) ("[T]he Department of Labor and Industrial Relations, including its director and appellate board, is an 'agency' within the meaning of HRS § 91–1(1).")

2. HRS § 386–85(1) provides as follows:

**Presumptions.** In any proceeding for the enforcement of a claim for compensation under this chapter it shall be *presumed,* in the absence of *substantial evidence* to the contrary:

(1) That the claim is for a covered work injury[.]

(Boldfaced font in original.) (Emphases added.)

sufficient to justify a conclusion by a reasonable person that an injury or death is not work connected." *Id.* (citations, internal quotation marks, and brackets omitted).[3] "If the evidence is substantial, the Board must weigh and consider the evidence offered by the employer against the evidence offered by claimants supportive of the claim." *Id.* (internal quotation marks and citations omitted). And "if, as a result of the weighing, there is a reasonable doubt as to whether an injury is work connected, it must be resolved in favor of the claimant." *Id.* (internal quotation marks and citations omitted).

However, the ICA cites to *Mitchell v. Department of Educ.*, 85 Hawai'i 250, 942 P.2d 514 (1997), which, in effect, stacks onto this framework two additional appellate standards of review, to the effect that,

> [appellate] review is "further qualified by the principle that [ (1) ] the agency's decision carries a presumption of validity and [ (2) ] appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences." *Sussel v. Civil Serv. Comm'n*, 74 Haw. 599, 608, 851 P.2d 311, 316, *reconsideration denied,* 74 Haw. 650, 857 P.2d 600 (1993) (citation and internal brackets omitted); *Bragg v.*

*State Farm Mut. Auto. Ins. Co.*, 81 Hawai'i 302, 304, 916 P.2d 1203, 1205 (1996) (citation omitted).

85 Hawai'i at 254, 942 P.2d at 518.

## II.

### A.

The standard granting "a presumption of validity" to agency decisions is also cited to by the employer, University of Hawai'i (UH). Citing *Dole Hawaii Div.—Castle & Cooke v. Ramil,* 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990), UH suggests, in its Petition, that, "[w]hen considering mixed questions of fact and law, an appellate court must give deference to the agency's *expertise* and experience in the particular field." (Emphasis added.) Contrary to wayward suggestions in the cases, deference to the expertise of an agency is not the same as the deference afforded the Board "in assessing the relative credibility and weight of the evidence for and against compensability[.]" Majority opinion at 270, 47 P.3d 737.

In deferring to the Board's resolution of conflict in testimony or the weight of the evidence, we do no more than recognize the role of the Board as fact finder.[4] That is an

---

3. The definition of the term "substantial evidence," as used in workers' compensation cases and in HRS § 386-38(1), was borrowed from the "substantial evidence" test used by courts on appellate review. *See Acoustic, Insulation & Drywall, Inc. v. Labor and Indus. Relations Appeal Bd.,* 51 Haw. 312, 459 P.2d 541 (1969) ("Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (Citing *Appalachian Elec. Power Co. v. National Labor Relations Bd.,* 93 F.2d 985, 989 (4th Cir.1938); *National Labor Relations Bd. v. Thompson Prods.,* 97 F.2d 13, 15 (6th Cir.1938); *Ballston–Stillwater Knitting Co. v. National Labor Relations Bd.,* 98 F.2d 758, 760 (2 Cir.1938).) The cases relied upon by *Acoustic* referenced 29 U.S.C.A. § 160(e), which provided the standard of review for courts under the National Labor Relations chapter:

> Section 10(e) of the Act, 29 U.S.C.A. § 160(e), provides that[,] "[t]he findings of the Board as to the fact, if supported by evidence, shall be conclusive." Hence this court is not at liberty to review the evidence and make its own findings; but neither is it bound to accept findings based on evidence which merely creates a suspicion or gives rise to an inference that cannot

reasonably be accepted. The statute means that the [National Labor Relations] Board's findings are conclusive if supported by substantial evidence.

*Ballston–Stillwater Knitting Co.,* 98 F.2d at 760 (internal citations omitted). However, HRS § 386-85(1)'s use of the term "substantial evidence" should not be confused with the same term in HRS § 91–14(g)(5), which establishes the standard for judicial review of the sufficiency of an agency's record.

4. *See De Victoria v. H & K Contractors,* 56 Haw. 552, 545 P.2d 692 (1976). In that case, this court traced the legislative history of the "clearly erroneous" standard in HRS § 91–14(g)(5). "The specific language of original HRS [§ ] 91–14(g) was taken from the corresponding section of the first tentative draft of the revision of the Model State Administrative Procedure Act." *Id.* at 557, 545 P.2d at 697. Referring to the Commissioners' Note pertaining to this provision, 9C U.L.A. 159 (Supp.1967), this court determined that the correct review of administrative decisions under the "clearly erroneous" test of HRS § 91–14(g)(5) was similar to that of fact finders under the Federal Rules of Civil Procedure (FRCP) Rule 52(a). *See id.* at 558, 545 P.2d at

entirely different matter from affording "a presumption of validity" to an agency decision, or doing so because of the "expertise" of an agency in making technical, scientific, or policy determinations that the legislature has specifically left to the agency. *See, e.g., New York Times Sales v. Commissioner of Revenue,* 40 Mass.App.Ct. 749, 667 N.E.2d 302, 304 (1996) (appellate tax board's expertise in tax matters), *review denied by* 423 Mass. 1108, 671 N.E.2d 952 (1996); *Morton Int'l v. Auditing Div. of Utah State Tax Comm'n,* 814 P.2d 581, 586 (Utah 1991) (observing that "it is not the characterization of an issue as a mixed question of fact and law or the characterization of the issue as a question of general law that is dispositive of the determination of the appropriate level of judicial review[,]" but, rather, "the dispositive factor is whether *the agency, by virtue of its experience or expertise, is in a better position than the courts to give effect to the regulatory objective to be achieved"* (emphasis added)).

Deference, with respect to the credibility of witnesses and the weight of the evidence, is accorded to fact finders sitting in administrative and judicial forums. *See, e.g., Tamashiro v. Control Specialist, Inc.,* 97 Hawai'i 86, 92, 34 P.3d 16, 22 (2001) (stating that "the credibility of witnesses and the weight to be given their testimony are within the province of the trier of fact and, generally, will not be disturbed on appeal" in a worker's compensation case) (citing *State v. Jenkins,* 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000)); *Bank of Hawai'i v. Kunimoto,* 91 Hawai'i 372, 390–91, 984 P.2d 1198, 1216–17, *reconsideration denied,* 91 Hawai'i 372, 984 P.2d 1198 (1999); *In re Estate of Herbert,* 90 Hawai'i 443, 454, 979 P.2d 39, 50, *as amended on denial of reconsideration by* 90 Hawai'i 443, 979 P.2d 39 (1999); *State v. Kekaualua,* 50 Haw. 130, 132, 433 P.2d 131, 133 (1967) ("The jury is the sole judge of the credibility of the witnesses or the weight of the evidence." (Internal citations omitted.)).

On appeal, such determinations of credibility and of the weight of evidence are not subject to a presumption of validity or to

deference based on any specific agency "expertise." Rather, inasmuch as it is the fact finder who observes the demeanor of the witnesses and receives the evidence, it is the fact finder who is best qualified to make decisions regarding the credibility of testimony and the weight to be given evidence. Our acknowledgment of the fact finder's superiority in this realm stems from recognition of the division of function between the agency as the fact finder and our role as reviewer of the record.

Accordingly, we defer to the Board's evaluation for the foregoing reasons, unless we believe it to be clearly erroneous, and not because of any "presumption" or because of any scientific or technical expertise. *Cf. Kekaualua,* 50 Haw. at 133, 433 P.2d at 132 ("When a jury verdict involves conflicting evidence and depends on the determination of credibility of witnesses or the weight of evidence, the test on appeal is whether there is substantial evidence to support the verdict of the jury." (Citing, *inter alia, Territory v. Ebarra,* 39 Haw. 488, 492, 1952 WL 7373 (1952); *State v. Carvelo,* 45 Haw. 16, 33, 361 P.2d 45, 54–55 (1961); *State v. Tamanaha,* 46 Haw. 245, 251, 377 P.2d 688, 692 (1962), *reh'g denied,* 46 Haw. 345, 379 P.2d 592 (1963).)).

For, presuming the validity of the Board's decisions as to credibility and weight, or because of its "expertise," undermines the clearly erroneous rule imposed by statute, *see* HRS § 91–14(g)(5) (establishing that a finding of fact is subject to a determination of whether it is "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record"), and confirmed in our case law, *see, e.g., Korsak v. Hawaii Permanente Med. Group, Inc.,* 94 Hawai'i 297, 302–03, 12 P.3d 1238, 1243–44 (2000); *Tate v. GTE Hawaiian Tel. Co.,* 77 Hawai'i 100, 102–03, 881 P.2d 1246, 1248–49 (1994); *Chung,* 63 Haw. at 651–52, 636 P.2d at 727. The result would be to supplant the "clearly erroneous" standard in this context, *see id.,* in favor of one in which appellate courts would essentially decline to provide any review at all.

697. The replacement of the substantial evidence rule with the clearly erroneous rule "places court review of administrative decisions

on fact questions under the same principle as that applied under the [FRCP] in connection with review of trial court decision[s]." *Id.*

### B.

In connection with the foregoing, the majority, in my view, mischaracterizes *Chung*. The majority states that "*Chung* does not stand for the broad proposition that the Board is mandated to reconcile conflicting expert testimony in favor of the claimant; that proposition would eviscerate the well established rule that the Board's determinations of credibility and weight are entitled to deference." Majority opinion at 270, 47 P.3d at 737 (citation and emphasis omitted). I believe that this statement confuses what is required of the Board with what is required of appellate courts, and invites error by both bodies.

As to the Board's responsibility, nowhere does *Chung* intimate, as the majority states, that the principle that "conflicting expert opinion should be resolved in favor of the claimant derives from ... the presumption [that] compensability is not rebutted when there is equally credible conflicting evidence as to causation[.]" Majority opinion at 270, 47 P.3d at 737. Rather, the *Chung* court said that "coverage will be presumed at the outset, subject to being rebutted by substantial evidence[,]" 63 Haw. at 651, 636 P.2d at 727 (citing HRS § 386–85), and "where there *is a reasonable doubt* as to whether an injury is work-connected, *it must be resolved in favor of the claimant.*" *Id.* (citation omitted) (emphases added).

As to this court's responsibility, rather than couching review in terms of a "due deference" standard, majority opinion at 270, 47 P.3d at 737, the appropriate standard of review, long set down in cases and specifically held so in the work-relatedness question raised in *Chung*, is whether the agency decision was "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.]" 63 Haw. at 651, 636 P.2d at 727 (citations omitted).

The standard of review governing this court's examination of the [Board]'s decision is contained in Hawai'i's Administrative Procedure Act, which provides, in pertinent part, that "*the court may affirm or reverse the decision and order of an administrative body if the administrative*

*findings, conclusions, [decisions,] or orders are:* ... *(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record.* ..." HRS § 91–14(g) (1976); *DeFries v. Ass'n Owners,* [57 Haw. 296, 302, 555 P.2d 855, 859 (1976) ]; *De Victoria v. H & K Contractors,* 56 Haw. 552, 556, 545 P.2d 692, 696–97 (1976). The "clearly erroneous" standard requires the court to sustain the Board's findings unless the court is "left with a firm and definite conviction that a mistake has been made." *Id.* at 557–58, 545 P.2d at 697–98.

*Id.* at 651–52, 636 P.2d at 727 (some ellipsis points omitted) (emphasis added).

### III.

The second standard, imposing a "heavy burden" on the appellant to "convincing[ly]" show an "unjust and unreasonable" result, is wrongly applied in workers' compensation cases. The history of that standard plainly demonstrates its inapplicability to workers' compensation cases. In *In re Application of Kauai Elec. Div. of Citizens Utilities Co.,* 60 Haw. 166, 590 P.2d 524 (1978) [hereinafter *Kauai Electric* ], this court indicated that the standard to be applied in energy rate adjustments is "just and reasonable," because the applicable statute, HRS § 269–16, "requires that all rates and charges must be 'just and reasonable.'" *Id.* at 181, 590 P.2d at 535. Observing that "[t]he language of the statute grants to the [Public Utilities] Commission [ (Commission) ] broad discretionary power in the area of rate regulation," *id.* at 179, 590 P.2d at 534, this court said that

[t]he rule is that the burden is always on the applicant to prove justification for a requested increase before the Commission. *In re Application of Hawaiian Electric Co., Inc.,* 56 Haw. 260, 270, 535 P.2d 1102[, 1109] (1975). However, once the Commission has made an order, the order carries a presumption of validity and one seeking to upset the order carries "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." *Federal Power Commission v. Hope Natural Gas Co.,* 320

U.S. [591,] 602, 64 S.Ct. 281, 88 L.Ed. 333 [ (1944).]

*Id.* at 187, 590 P.2d at 538 (some internal citations omitted).

The *Kauai Electric* court adopted the standard set forth in *Hope Natural Gas,* which construed a similar federal statute, 15 U.S.C. § 717c,[5] requiring that rates set by the Federal Power Commission be "just and reasonable." In that case, the United States Supreme Court relied specifically upon the language of the statute in declaring that "when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act." *Hope Natural Gas,* 320 U.S. at 602, 64 S.Ct. 281.

> We held in *Federal Power Commission v. Natural Gas Pipeline Co.,* [315 U.S. 575, [62 S.Ct. 736] (1942) ], that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of "pragmatic adjustments." And when the Commission's order is challenged in the courts, the question is whether that order "viewed in its entirety" meets the requirements of the Act. Under the statutory standard of "just and reasonable" it is the result *reached* not the *method* employed which is controlling. It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. *And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because*

it is unjust and unreasonable in its consequences.

*Hope Natural Gas,* 320 U.S. at 602, 64 S.Ct. 281 (emphasis added). Subsequently, several Hawai'i cases cited to and quoted from this proposition, primarily within the context of "just and reasonable" rate-setting under HRS § 269–16. *See In re Application of Hawaiian Elec. Co.,* 81 Hawai'i at 465, 918 P.2d at 567 (rule-making by the Public Utilities Commission); *In re Application of Hawaiian Tel. Co.,* 67 Haw. 370, 381, 689 P.2d 741, 749 (1984) (HRS § 269–16(b)); *In re Application of Hawaii Elec. Light Co.,* 67 Haw. 425, 432, 690 P.2d 274, 279 (1984) (treatment of special revenue bonds in rate-making); *Application of Hawaiian Tel. Co.,* 65 Haw. 293, 296, 651 P.2d 475, 479 (1982) (HRS § 269–16(b)), *overruled in part by Camara v. Agsalud,* 67 Haw. 212, 685 P.2d 794 (1984); *Jones v. Hawaiian Elec. Co.,* 64 Haw. 289, 292, 639 P.2d 1103, 1107 (1982) (HRS § 269–16), *overruled in part by Camara, supra; In re Application of Hawaii Elec. Light Co.,* 60 Haw. 625, 630, 594 P.2d 612, 616 (1979) (HRS § 269–16(f)); *In re Hawaiian Elec. Co.,* 42 Haw. 233, 243 (1957) ("Under [Revised Laws of Hawai'i] 1955, § 104–15, the Public Utilities Commission is authorized to prescribe an accounting system for a public utility which shall be just and reasonable[.]"), *reh'g denied,* 42 Haw. 298 (1958).

However, the unjust and unreasonable language in rate-making cases has crept into appellate court decisions in workers' compensation cases, *see e.g., Tam v. Kaiser Permanente,* 94 Hawai'i 487, 490, 17 P.3d 219, 222 (2001) ("Tam failed to carry her burden of convincingly demonstrating that the Director's order violated HAR § 12–10–75(c), *see In Re Gray Line Hawaii, Ltd.,* 93 Hawaii 45, 53, 995 P.2d 776, 784 (2000) ('[A] presumption of validity is accorded to decisions of administrative bodies acting within their sphere of expertise and one seeking to upset the order bears the heavy burden of making

---

**5.** In pertinent part, 15 U.S.C. § 717c(a) states:

a) *Just and reasonable rates and charges* All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, *shall be just and reasonable,* and any such rate or charge that is *not just and reasonable is declared to be unlawful.*

(Emphases added.)

**276**

a convincing showing that it is invalid because it is unjust and unreasonable in its consequences[.]' " (Citations omitted.)).); *Potter v. Hawaii Newspaper Agency,* 89 Hawai'i 411, 421, 974 P.2d 51, 61 (1999); *Government Employees Ins. Co. v. Dang,* 89 Hawai'i 8, 11, 967 P.2d 1066, 1069 (1998); *Mitchell,* 85 Hawai'i at 254, 942 P.2d at 518; *Bocalbos v. Kapiolani Med. Ctr. for Women & Children,* 93 Hawai'i 116, 131 n. 29, 997 P.2d 42, 57 n. 29 (App.), *cert. denied,* 93 Hawai'i 116, 997 P.2d 42 (2000), as an additional expression of deference to agencies.[6] Inasmuch as the "unjust and unreasonable" standard is one derived from the text of a specific statute enacted with respect to ratemaking, it is entirely alien to the workers' compensation area and should not be further employed by the appellate courts in subsequent workers' compensation cases.

## IV.

Recently, in *Igawa,* the majority upheld the Board's decision "[d]espite the Board's failure to expressly address the standards it applied[.]" 97 Hawai'i at 409 n. 6, 38 P.3d at 577 n. 6. In so holding, I believe the majority in *Igawa* effectively removed from this court's review, the question of whether the agency had performed "reasoned decision making[.]" *Id.* at 412, 38 P.3d at 580 (Acoba, J., concurring and dissenting) (quoting *In re Application of Hawaii Elec. Light Co.,* 60 Haw. at 642, 594 P.2d at 623).

As in *Igawa,* here again, the Board did not indicate that the employer, UH, adduced substantial evidence to overcome the presumption in HRS § 365–85(1) that claimant Bruce Nakamura's injury was work-related. "An agency's findings must be sufficient to

allow the reviewing court to track the steps by which the agency reached its decision." *Kilauea Neighborhood Ass'n v. Land Use Comm'n,* 7 Haw.App. 227, 230, 751 P.2d 1031, 1034 (1988) (citing *Nani Koolau Co. v. K & M Constr.,* 5 Haw.App. 137, 140–41, 681 P.2d 580, 584 (1984)). Despite the fact that this court has said the Board "should generally state whether or not it has in fact applied the presumption[,]" *Tate v. GTE Hawaiian Tel. Co.,* 77 Hawai'i 100, 107, 881 P.2d 1246, 1254 (1994) (quoting *Survivors of Freitas v. Pacific Contractors Co.,* 1 Haw.App. 77, 85, 613 P.2d 927, 933 (1980)), and that the purpose behind requiring agencies to expressly set out their findings is "to assure reasoned decision making by the agency and enable judicial review of agency decisions," *In re Application of Hawaii Elec. Light Co.,* 60 Haw. at 642, 594 P.2d at 623, such entreaties have gone unheeded.

As a result, the decision making process by the Board is not validated by our review, *see Igawa,* 97 Hawai'i at 412, 38 P.3d at 580 (Acoba, J., concurring and dissenting) (citing *In re Application of Hawaii Elec. Light Co.,* 60 Haw. at 641–42, 594 P.2d at 623), and agency decisions are largely placed beyond the purview of this court, as well. With all due respect, the narrowing scope of review countenanced by the majority abdicates the responsibilities owed to the parties who appeal these cases to this court.

---

6. Such language has also been incorrectly used in non-rate-making cases. *See, e.g., Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998); *Kahana Sunset Owners Ass'n v. County of Maui,* 86 Hawai'i 66, 68, 947 P.2d 378, 380 (1997); *Sussel,* 74 Haw. at 608, 851 P.2d at 316; *Outdoor Circle v. Harold K.L. Castle Trust Estate,* 4 Haw.App. 633, 639, 675 P.2d 784, 789 (1983) (decisions by the Land Use Commission), *cert. denied,* 67 Haw. 1, 677 P.2d 965 (1984).